**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>MAIETTA CONSTRUCTION, INC.,<br><br>       Debtor. | Chapter 11<br>Case No. 10-21171 |
| In re:<br><br>MAIETTA ENTERPRISES, INC.,<br><br>       Debtor. | Chapter 11<br>Case No. 11- 20197 |

**JOINT DISCLOSURE STATEMENT WITH RESPECT TO PLAN OF**
**REORGANIZATION OF DEBTORS DATED MARCH 4, 2011**

Maietta Construction, Inc. and Maietta Enterprises, Inc.[1] (each a "<u>Debtor</u>" and, jointly,

the "<u>Debtors</u>") present this disclosure statement (the "<u>Disclosure Statement</u>"), pursuant to 11

U.S.C. § 1125(b), to all known creditors of and holders of interests in and to the Debtors in

connection with the Debtors' Joint Plan of Reorganization Dated March 4, 2011 (the "<u>Plan</u>").

**I.      Plan Summary**

Creditors and interest holders are directed to read this entire Disclosure Statement and

should not rely solely on this summary in deciding to vote for the Plan.  The following is a short

summary of the principal features of the Plan.

1.      As detailed below, the Plan calls for the limited substantive consolidation of the

Debtors. The Debtors believe that the facts dictate that result, which is also in accord with

current law.[2]  Substantive consolidation will not affect, modify, discharge, reduce or expand the

---

[1] Maietta Enterprises, Inc. is the successor by merger of Maietta Foundations, Inc., GLM Associates, Inc., M7 Properties, LLC, and Pleasant Hill Auto Sales, Inc.

[2] The First Circuit approved substantive consolidation of multiple debtors in <u>Woburn Associates v. Kahn (In re Hemingway Transport, Inc.)</u>, 954 F.2d 1, 12 (1st Cir. 1992), in which the First Circuit applied the so-called <u>Auto-</u>

1

lien, mortgage or security interest of any secured creditor. Substantive consolidation has no effect on any class of creditors, other than unsecured creditors and tax claims, which classes of claims have their positions enhanced by substantive consolidation. Following confirmation of the Plan, the Debtors will be merged pursuant to state law in a tax-free reorganization, with Enterprises emerging as the surviving entity and Reorganized Debtor.

2.      The secured claim of V&E (as defined below) in the amount of over $2 million will be converted to equity in the reorganized, consolidated entity, thus removing over $2 million of debt from the balance sheet of the Reorganized Debtor.

3.      The secured claims of Caterpillar and Blackstone (both as defined below), as reduced by prior and contemplated equipment sales, will be amortized over a seven-year period, with all liens retained, unless sooner satisfied by refinancing.

4.      The claims of the IRS and the State of Maine for unpaid taxes will be paid in accordance with sections 1129(a)(9)(C) and (D) of the Bankruptcy Code, unless sooner satisfied by refinancing, or satisfied pursuant to an agreement with such entities.

5.      The claim of Berkley (as defined below) will be satisfied in accordance with a current settlement, and its rights under its existing documents, including the general indemnity agreement under which Berkley underwrites bonds, will be left unimpaired under the Plan.

6.      Other secured claims will be left unimpaired or will be paid in accordance with settlements reached between the Debtors and the Holders of such Allowed Secured Claims.

7.      Unsecured claims of the consolidated entities will be paid a percentage of the net income of the Reorganized Debtor until the earlier of (i) the date such claims are paid in full; or (ii) December 31, 2018.

---

Train factors. *See* Logistics Information Systems, Inc. v. Braunstein (In re Logistics Information Systems, Inc.), 432 B.R. 1, 11 (D. Mass. 2010) (concluding same). For additional discussion of substantive consolidation, *see* Article XI, supra.

## II.    Introduction

The purpose of this Disclosure Statement is to provide such information as may be deemed material, important and necessary for the Debtors' creditors and holders of interests to make an informed decision in exercising their right to vote, if any, to accept or reject the Plan. This Disclosure Statement will also assist the Bankruptcy Court in its determination as to whether the Plan complies with all applicable provisions of 11 U.S.C. § 101 et seq. (the "Code") and should therefore be confirmed.  All exhibits to this Disclosure Statement, as well as the Plan, are incorporated into and made a part of this Disclosure Statement.

**IT IS RECOMMENDED THAT EACH CREDITOR AND HOLDER OF AN INTEREST REVIEW THE ENTIRE PLAN AND DISCLOSURE STATEMENT CAREFULLY AND DETERMINE WHETHER OR NOT TO ACCEPT THE PLAN BASED ON THAT CREDITOR'S OR INTEREST HOLDER'S INDEPENDENT EVALUATION AND JUDGMENT.  IT IS IMPORTANT THAT YOU VOTE IF YOU HAVE A RIGHT TO VOTE.  IN DETERMINING WHETHER A PLAN OF REORGANIZATION HAS BEEN ACCEPTED BY THE REQUIRED MAJORITIES OF CREDITORS AND INTEREST HOLDERS, ONLY THOSE CREDITORS AND INTEREST HOLDERS WHO ACTUALLY VOTE ON THE PLAN ARE COUNTED, EXCEPT WHERE SPECIFICALLY STATED OTHERWISE**.

**NO REPRESENTATIONS CONCERNING THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  THE PORTIONS OF THIS DISCLOSURE STATEMENT DESCRIBING THE DEBTORS, THE PLAN, AND THE PRE- AND POST-BANKRUPTCY OPERATIONS OF THE DEBTORS, HAVE BEEN PREPARED FROM INFORMATION SUBMITTED BY**

REPRESENTATIVES OF THE DEBTORS. THE DEBTORS BELIEVE THIS INFORMATION TO BE ACCURATE AND COMPLETE BUT MAKE NO WARRANTIES AS TO SUCH COMPLETENESS OR ACCURACY. NO REPRESENTATIONS CONCERNING THE DEBTORS ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.

### III. Description of the Debtors and Certain Prior Affiliates

A. Maietta Construction, Inc. and Its Operating Structure

Maietta Construction, Inc. ("Construction") has been in the construction business for over forty-five years, during which it emerged as a successful contractor hired to provide excavation and construction services on a number of high profile construction jobs in southern Maine. As of the date of this Disclosure Statement, the following individuals (defined below as the "Individual Shareholders") own the percentages of the common stock of Construction:

a. James Maietta—11.67%

b. Louis Maietta—9.16%

c. Louis Maietta, Jr.—11.67%

d. Michael Maietta—11.67%

e. Neil Maietta—11.67%

f. Robert Maietta—11.67%

g. Thomas Maietta—11.67%

h. Vincent Maietta—11.67%

i. Roberta Maietta—9.16%

Construction does not own record title to any real property, and its primary assets are heavy equipment and titled vehicles, all of which are collateral for various secured claims. As discussed more fully below, Construction exclusively handled construction operations until it encountered, prepetition, certain operational and financial difficulties.

B.    Construction's Pre-Petition Secured Debt

Over a period of approximately ten years, Construction and/or certain of its Affiliates entered into various financing transactions with Caterpillar Financial Services Corporation ("Caterpillar") pursuant to which Construction and/or certain affiliated entities (the "Affiliates") borrowed funds from Caterpillar to finance the purchase of certain pieces of heavy equipment. On or about October 24, 2008, Construction executed two certain Security Agreements and Promissory Notes (collectively, the "Roll-up Agreements"), pursuant to which Construction promised to pay to Caterpillar a principal amount of $1,441,553.66 and $599,169.73, respectively. The Roll-Up Agreements effectively "rolled up" the various loan agreements entered into by Construction and/or the Affiliates with Caterpillar. As a result of these transactions, Construction allegedly owed Caterpillar approximately $1.38 million as of the Filing Date. This indebtedness is secured, at least in part, by security interests in certain pieces of heavy equipment owned by Construction. Construction has alleged that perfection issues exist as to certain alleged liens of Caterpillar.

As a result of cash flow pressures, Construction fell behind on its tax obligations to the IRS and the State of Maine, primarily for withholding taxes. In mid to late-2009, Construction owed several hundred thousand dollars in tax liabilities, including accrued interest and penalties.

On or about September 17, 2009, Construction, certain Affiliates, certain principals of the Debtor and the Affiliates, and Blackstone Equipment Financing LP ("Blackstone") consummated a financing transaction (the "Blackstone Transaction") pursuant to which Construction (and the Affiliates) executed a bill of sale purportedly selling certain pieces of heavy equipment and titled vehicles to Blackstone, which Blackstone then purportedly leased back to Construction and the Affiliates. Construction and Blackstone dispute whether the Blackstone Transaction was a secured loan transaction or instead a sale-leaseback. As discussed more fully below, Construction maintains that the Blackstone Transaction was in fact a secured loan transaction. As a result of the Blackstone Transaction, Blackstone advanced $700,000.00 to Construction and Construction was required to make monthly payments to Blackstone in the amount of $19,641.93. The bulk of the money was used to retire then-existing tax liabilities. As of the Filing Date, assuming the Blackstone Transaction is determined to be a financing, Construction owed approximately $586,000.00 to Blackstone. This indebtedness is secured by the pieces of heavy equipment and titled vehicles owned by Construction and the Affiliates and by mortgages on various parcels of real property owned by Affiliates and certain guarantors. Construction's obligations to Blackstone are either co-made or guaranteed by certain Affiliates and by certain individual guarantors who are Individual Shareholders.

Construction also entered into certain financing transactions with Ford Motor Credit Company, LLC ("Ford Credit") and Daimler Financial Services North America, LLC ("DCFS") with respect to certain titled vehicles. Specifically, Construction entered into a financing transaction with DCFS in relation to four titled vehicles, pursuant to which DCFS had a first priority lien on those vehicles. Additionally, Construction entered into a financing transaction

with Ford Credit in relation to three titled vehicles, pursuant to which Ford Credit has a first priority lien on those vehicles.

As Construction continued to incur losses, Construction also borrowed funds from V&E Enterprises ("V&E"), an entity controlled by Vincent Maietta. The loans from V&E, which eventually totaled in excess of $2 million, were secured by first liens on previously unencumbered assets of Construction and junior liens on all other assets of Construction, as well as liens on the Affiliates' assets.

Notwithstanding the Blackstone Transaction, and the loans from V & E, Construction continued to suffer losses and, accordingly, accrued additional tax liabilities, as detailed below, which liabilities are allegedly secured by liens on Construction's assets.

C.    Performance and Payment Bonds

Prepetition, Construction primarily obtained the performance and payment bonds ("Bonds") necessary for it to engage in construction projects from Berkley Regional Insurance Company ("Berkley"), although Construction used other companies as well. Pursuant to a General Agreement of Indemnity (the "GIA") executed on August 8, 2008, Berkley agreed to issue Bonds (subject to certain underwriting criteria), and Construction, certain Affiliates, and certain principals of Construction and the Affiliates, agreed to indemnify Berkley for any losses it might incur in connection with the issuance of Bonds to Construction.

D.    Maietta Enterprises and other Affiliates.

(i)    Maietta Enterprises, Inc. ("Enterprises")

Enterprises was originally formed primarily to own and operate certain gravel pits, two of which are located in Standish, Maine (the "Standish Gravel Pits") and one of which is located in Baldwin, Maine (collectively, the "Gravel Pits"), and which Gravel Pits supported the operations of Construction. As of the start of Construction's chapter 11 case, each of the

three Gravel Pits was encumbered by first priority mortgages held by TD Bank, N.A. ("TD Bank"). Enterprises owed approximately $28,000.00 to TD Bank in relation to these mortgages. Pursuant to a settlement agreement between Enterprises and Berkley, the mortgage held by TD Bank on the Standish Gravel Pits was paid down, and Berkley obtained a mortgage on the Standish Gravel Pits to secure amounts owed with respect to previously-issued Bonds, as well as to secure obligations as to future bonds, all pursuant to the GIA. Additionally, the Gravel Pit located in Baldwin is encumbered by a mortgage held by McGoldrick Brothers Blasting Services, Inc., in relation to which Enterprises owes approximately $23,000.00. In addition to the Gravel Pits, Enterprises owns certain pieces of heavy equipment used by both Enterprises and Construction in the ordinary course of business. Either Caterpillar or Blackstone (among others) purport to hold security interests in and to these pieces of equipment.

Prior to the merger of Enterprises with other Affiliates (as described below, the "Merger"), the following individuals owned the following percentages of the common stock of Enterprises:

    a.  James Maietta—14.28%

    b.  Michael Maietta—14.28%

    c.  Neil Maietta—14.28%

    d.  Thomas Maietta—14.28%

    e.  Vincent Maietta—14.28%

    f.  Robert Maietta—14.28%

    g.  Louis Maietta, Jr.—14.28%

    (ii)       GLM Associates, Inc. ("GLM")

Prior to the Merger, GLM was a real estate holding company which owned various parcels of real property in South Portland and Scarborough, Maine, some of which house Construction's operations. The parcels are as follows:

a.     300 Main Street, South Portland, Maine (the "Main Street Property");

b.     14 Gary L. Maietta Parkway, South Portland, Maine (the "Maietta Parkway Property");

c.     0 Elderberry Drive, Tax Map 58, Lot 21, South Portland, Maine;

d.     Detention basin adjacent to Crossmeadow Road, South Portland, Maine;

e.     148 Pleasant Hill Road, Scarborough, Maine; and

f.     158 Pleasant Hill Road, Scarborough, Maine (collectively with the property located at 148 Pleasant Hill Road, the "Pleasant Hill Road Properties").

The Main Street Property is encumbered by a first priority mortgage held by Gorham Savings Bank ("Gorham Savings"), to secure an obligation in the original the principal amount of $562,000.00 and in relation to which a balance is currently due of approximately $468,000.00. The Maietta Parkway Property is encumbered by a first priority mortgage also held by Gorham Savings to secure an obligation in the original principal amount of which was $293,000.00 and in relation to which a balance is currently due of approximately $259,000.00. Bangor Savings Bank ("Bangor Savings") held a first priority mortgage on the Pleasant Hill Properties to secure an obligation in the in the original principal amount of $1.785 million and in relation to which a balance was due of approximately $1.59 million.[3]

Prior to the Merger, GLM also owned certain pieces of heavy equipment used by the Debtor in the ordinary course of business, as well as a titled vehicle possibly subject to a lien

---

[3] Prior to the Merger, V&E purchased certain property generally located at 148 Pleasant Hill Road, Scarborough, Maine and V&E assumed about $775,000.00 of the secured debt owed to Bangor Savings Bank relating to this property.

held by TD Bank. Finally, GLM held a mortgage on 67 Gary L. Maietta Parkway, Unit 23, South Portland, Maine, in the principal amount of $37,600.00, and was the assignee of certain leases associated with the real property located at 154 Pleasant Hill Road, South Portland, Maine.

Prior to the Merger, the following individuals owned the following percentages of the common stock of GLM:

a. James Maietta—14.29%

b. Michael Maietta—14.29%

c. Neil Maietta—14.28%

d. Thomas Maietta—14.29%

e. Vincent Maietta—14.29%

f. Robert Maietta—14.28%

g. Louis Maietta, Jr.—14.28%

(iii)    Maietta Foundations, Inc. ("Foundation")

Foundation was formed primarily to operate a foundation-pouring business. Prior to the Merger, Foundation owned approximately $12,000.00 in small tools. Foundation did not own any real property or heavy equipment; however, Foundation did own four titled vehicles. Blackstone, Ford Credit, and the successor to Shawmut Bank each have a first priority lien on three of the vehicles, and the fourth is unencumbered.

Prior to the Merger, the following individuals owned the following percentages of the common stock of Foundation:

a. James Maietta—14.29%

b. Michael Maietta—14.29%

c. Neil Maietta—14.28%

d. Thomas Maietta—14.29%

e. Vincent Maietta—14.29%

f. Robert Maietta—14.28%

g. Louis Maietta, Jr.—14.28%

(iv)  Pleasant Hill Auto Sales, Inc. ("Pleasant Hill Auto")

Pleasant Hill Auto operated an automobile sales operation. Pleasant Hill Auto does not own any real property. Prior to the Merger, Pleasant Hill Auto's primary assets were titled vehicles, the majority of which are subject to the interests of a single lienholder. Construction used various trucks owned by Pleasant Hill Auto in the ordinary course of its business.

Prior to the Merger, the following individuals owned the following percentages of the common stock of Pleasant Hill Auto:

a. James Maietta—12.86%

b. Michael Maietta—12.86%

c. Neil Maietta—12.86%

d. Thomas Maietta—12.86%

e. Vincent Maietta—12.86%

f. Robert Maietta—12.86%

g. Louis Maietta, Jr.—12.86%

h. Louis Maietta, Sr.—10%

(v)  M7 Properties, LLC ("M7")

M7 was a real estate holding entity which owned a parcel of real property located at 150 Pleasant Hill Road, Scarborough, Maine (the "150 Pleasant Hill Property"). The 150 Pleasant Hill Property is encumbered by a first priority mortgage held by Blackstone, which secures M7's obligations as a guarantor in relation to the Blackstone Transaction. The 150 Pleasant

Hill Property was M7's primary asset. Prior to the Merger, M7 did not own any other real or personal property.

Prior to the Merger, the following individuals owned the following percentages of the membership interests in M7:

    a.  James Maietta—14.28%

    b.  Michael Maietta—14.28%

    c.  Neil Maietta—14.28%

    d.  Thomas Maietta—14.28%

    e.  Vincent Maietta—14.28%

    f.  Robert Maietta—14.28%

    g.  Louis Maietta, Jr.—14.28%

E.       <u>Prepetition Operations and Relationships Among the Affiliates</u>.

Prior to the start of Construction's chapter 11 case, the operations of Construction and the above-described Affiliates were largely indistinguishable. Construction used equipment owned by each of the Affiliates in the ordinary course of business, although there were no formal leases in place. Construction's headquarters was owned by an Affiliate, but rent was not paid on a regular basis. Employees of Construction performed services for the Affiliates, but were paid by Construction's revenues. Consolidated books and records were kept, but such records do not reflect all of the intercompany transactions or obligations.

When Construction encountered financial difficulties, detailed below, and lost bonding capacity, new construction work was undertaken by Enterprises, using Construction's equipment and employees.

**IV.    <u>Events Leading Up to the Chapter 11 Case of Construction</u>**

Prior to the start of its chapter 11 case, as noted, Construction operated a construction company which provided construction and excavation services on a number of large construction projects in southern Maine. In 2004 alone Construction's revenues totaled approximately $13 million. However, as a result of the general economic downturn that plagued the U.S. economy generally in 2008 and 2009, as well as the dramatic increase in fuel costs beginning in 2008, the amount of available construction projects decreased substantially and those that Construction did obtain produced low or no margin of profit due to the substantial decrease in pricing. As a result, in 2008 and 2009, Construction realized approximately $8 million in annual revenue.

Although Construction had weathered previous economic downturns, it was unprepared for the duration and severity of the most recent recession. Construction was highly leveraged. Construction made certain necessary adjustments to its business model, but losses continued and it became increasingly difficult for Construction to meet its obligations as they became due. As a result, Construction again fell behind on tax obligations, with all available cash being used to pay vendors and employees to stay operational. Loans from V&E and cash infusions from certain Affiliates allowed Construction to periodically catch up on its obligations, but Construction would fall behind again almost immediately.

Additionally, Construction lost money on two large construction projects, the Warren Avenue Roadway Construction and the Southern Maine Veterans Cemetery projects, due to certain disputes which arose in relation to those projects. Construction defaulted on the Bonds associated with those projects, as well as another Bond, due to its large debt service and aggressive collection efforts by the Internal Revenue Service (the "IRS"). As a consequence, Berkley ceased issuing Bonds to Construction.

In order for the operations of the family of companies to remain viable, Construction was forced to shift all construction projects to Enterprises; accordingly, construction operations were no longer exclusively concentrated in Construction.

Due to Construction's inability to obtain the requisite bonding, its losses with respect to certain substantial projects, and the burden of its large debt service, and faced with increasingly aggressive action by the IRS, Construction was forced to file a voluntary petition for relief under chapter 11 of the Code on July 21, 2010.

With the approval of the Bankruptcy Court, Construction retained Bernstein, Shur, Sawyer & Nelson, P.A. ("Bernstein Shur") as bankruptcy counsel and Spinglass Management Group, LLC ("Spinglass") as its financial advisor (and Mark Stickney as its Chief Restructuring Officer) to assist Construction in the prosecution of its chapter 11 case and the formulation of its Plan.

## V.    Significant Post-Petition Events in or related to the Construction Chapter 11 Case

A.    Leasing of Employees and Equipment to Enterprises and Continued Operations under Enterprises

Postpetition, Construction obtained orders from the Bankruptcy Court authorizing it to enter into employee and equipment leasing arrangements with Enterprises. Pursuant to these arrangements, Enterprises leased certain employees and certain trucks, trailers and equipment required for the operation of Enterprises' business in light of the transfer of all construction activity to Enterprises.

B.    The Berkley Settlement

As described above, prepetition, Berkley ceased issuing Bonds to Construction after its default under certain construction contracts. As a result of these defaults, Berkley was purportedly required to pay a total of $3,033,287.09 pursuant to certain Bonds, of which

$2,163,738.74 was offset by certain of the Affiliates or principals of the Affiliates pursuant to the GIA.

Postpetition, on August 25, 2010, Berkley commenced litigation (the "Berkley Litigation") against the Affiliates in federal district court for the District of Maine, seeking, inter alia, indemnification under the GIA in relation to Construction's defaults. The Berkley Litigation was subsequently settled by virtue of a Loan Agreement executed on January 5, 2011 by and between Enterprises and Berkley. Pursuant to the Loan Agreement, Enterprises agreed to execute and deliver a promissory note in the principal amount of $888,499.34, amortized over ten years at an interest rate of six percent per annum. Berkley agreed to advance funds to pay off the mortgage held by TD Bank on the Standish Gravel Pits, after which Enterprises granted Berkley a first priority mortgage on that property. As a result of this settlement, Construction will again receive bonding from Berkley, upon emergence from chapter 11, and Berkley agreed to write bonds for Enterprises (subject to normal underwriting criteria and the provision of collateral satisfactory to Berkley).

C.    The Blackstone Litigation and Motion for Relief from Stay

Post-petition, Construction initiated an adversary proceeding against Blackstone (the "Blackstone Litigation"), seeking, inter alia, a declaratory judgment that the Blackstone Transaction was in fact a secured financing transaction and not a sale-leaseback. As of the date of this Disclosure Statement, the Blackstone Litigation is unresolved. The Debtors intend to move for summary judgment shortly.

Additionally, prior to the commencement of the Blackstone Litigation, on October 1, 2010, Blackstone filed a motion for relief from stay (the "Blackstone Motion for Relief"), seeking to repossess the vehicles and equipment it claimed as collateral and/or an order requiring Construction to assume or reject the so-called lease agreement. At the January 7,

2011 evidentiary hearing on the Blackstone Motion for Relief, the Bankruptcy Court granted the Blackstone Motion for Relief, but left for subsequent adjudication the issues raised by the Blackstone Litigation.  After entry of the order granting the Blackstone Motion for Relief (the "Blackstone Order"), Construction filed a notice of appeal of the Blackstone Order.  On January 18, 2011, Construction filed a motion seeking a stay pending appeal, which motion was denied by the Bankruptcy Court.  A similar motion was filed with the Bankruptcy Appellate Panel and is pending.  The filing of the Enterprises chapter 11 case reimposed the automatic stay as to all of the Blackstone Collateral pledged by the Debtors, given the Construction lease with Enterprises.  The Debtors intend to aggressively prosecute the appeal and the Blackstone Litigation.

D.      The Potential Caterpillar Litigation

Post-petition, and for a period of several months throughout its case, Construction has sought to negotiate a settlement with Caterpillar whereby Construction would refinance its existing debt with Caterpillar.  Despite its good faith efforts, however, Construction has been unable to reach a settlement with Caterpillar.

Accordingly, assuming that Construction and Caterpillar remain unable to reach a settlement, Construction intends to initiate an adversary proceeding against Caterpillar (the "Caterpillar Litigation"), alleging, inter alia, that Caterpillar has improperly perfected its security interest, or has no security interest, in certain pieces of equipment purportedly securing its claim and has failed to subordinate V&E's security interest in certain pieces of equipment in which Caterpillar also claims to have an interest.  Additionally, pursuant to the Caterpillar Litigation, Construction intends to bring certain fraudulent transfer, preference, tortious interference with contract, and equitable subordination claims against Caterpillar.  As of the

date of this Disclosure Statement, Construction and Caterpillar are still in the process of negotiating a settlement based on the allegations set forth in Construction's draft complaint.

E.    The DCFS Compromise and Settlement Negotiations

Prepetition, as stated above, Construction entered into a financing transaction with DCFS in relation to certain titled vehicles, one of which is that certain 2006 MAC Trailer, VIN 5MADA34346C011247 (the "Trailer"). DCFS had a first priority lien on the Trailer, and its claim against Construction, as secured by the Trailer, totaled approximately $18,819.37. On or about November 2, 2010, the Trailer was involved in an accident and was deemed a "total loss" by Construction's insurance company, Crum & Forster (the "Insurance Company"). The Insurance Company valued Construction's insurance claim in relation to the Trailer at $35,870.00.

Following negotiations between Construction, the Insurance Company, and DCFS, the parties agreed that the Insurance Company would pay Construction $28,163.50 and Construction would credit the claim in the amount of $7,500.00 and retain possession of the Trailer. Additionally, DCFS agreed to accept $18,819.37 of the claim proceeds from Construction in satisfaction of its claim as to the Trailer, release its lien on the Trailer and transfer title to the Insurance Company, which would then transfer title to Construction. The Bankruptcy Court approved the settlement by an Order entered on January 19, 2011 and the parties have subsequently consummated the settlement.

Additionally, subsequent to the sale of equipment described below, Construction is in the process of negotiating a settlement with DCFS with respect to DCFS's lien on another titled vehicle. Construction anticipates that the settlement will entail DCFS refinancing the terms of its existing loan with respect to this vehicle, thereby lowering its monthly payment to DCFS.

F.    The Initial Sale of Equipment

In February 2011, Construction and certain of the Affiliates, pursuant to an order of the Bankruptcy Court, sold certain equipment. Net proceeds of the sale were $487,547.20. The following amounts were paid to secured creditors from the proceeds of the sale:

Caterpillar:     $29,979.57

DCFS:            $26,000.00

Blackstone:      $258,861.83

Of the remaining proceeds, $141,925.00 is being held in escrow pending resolution of challenges to certain liens and related issues, and $30,780.80 was paid into Construction's account as working capital.

G.    Continued Construction Operations

Following the commencement of Construction's chapter 11 case, substantially all construction operations were concentrated in Enterprises. Enterprises substantially completed substantial construction projects, including, but not limited to, work related to the construction of the Cracker Barrel restaurant near the Maine Mall in South Portland, Maine. Enterprises has a backlog of construction jobs for the Spring 2011 construction season.

## VI.    Enterprises' Chapter 11 Case

A.  Events Leading to Enterprises' Chapter 11 Filing

On December 13, 2010, the Court entered the Order on Motion for Order Authorizing the Debtor to Enter into Equipment Lease Agreement Pursuant to § 363 of the Bankruptcy Code [Docket No. 98 in Case No. 10-21171], pursuant to which Construction was authorized to lease its heavy equipment and titled vehicles to Enterprises under an Equipment Lease Agreement (the "Equipment Lease"). Accordingly, Enterprises acquired a leasehold interest in all of Construction's equipment and vehicles.

On January 10, 2011, Blackstone filed a Complaint for Money on Personal Guaranty and Conversion (the "Complaint") against Enterprises, GLM, Pleasant Hill Auto, M7, Foundation, and the individuals involved in the Blackstone Transaction (collectively, the "Defendants") in the United States District Court for the Central District of California (the "California Action").  In the Complaint, Blackstone alleged that the Defendants had breached the "leases" central to the Blackstone Transaction and the guaranties executed in relation to those lease agreements.  The Defendants timely filed answers to the Complaint.

Additionally, subsequent to the entry of the Blackstone Order, Blackstone commenced a forcible entry and detainer action (the "FED Action") against Construction, Foundation, Pleasant Hill Auto, Enterprises, and GLM in Cumberland County District Court on February 1, 2011, pursuant to which Blackstone sought to repossess the heavy equipment and titled vehicles subject to the lease agreements.  A hearing on the FED Action was scheduled for February 24, 2011 at 9:00 a.m. (the "FED Hearing").  While the defendants in the FED Action also asserted certain state law and other defenses, a loss at the FED Hearing threatened the complete demise of the business of Construction, Enterprises and all of the Affiliates.

B.  The Merger

On February 17, 2011, GLM, Pleasant Hill Auto, Foundation, and M7 merged with Enterprises under Maine state law, with Enterprises remaining the sole surviving corporation. Attached hereto as **Exhibit A** are true and correct copies of the State of Maine Articles of Merger executed on behalf of these entities.

C.  The Enterprises Chapter 11 Filing

Subsequent to the Merger, on February 24, 2011, and just prior to the FED Hearing, Enterprises filed its voluntary petition for chapter 11 relief, which case is currently pending under Case No. 11-20197.  Blackstone was notified of the filing by counsel to Construction and

Enterprises prior to commencement of the FED Hearing. In accordance with 11 U.S.C. § 362(a), and in light of the fact that Enterprises had a leasehold interest in all of Construction's heavy equipment and titled vehicles under the Equipment Lease, the automatic stay barred all relief sought in the FED Action, and Blackstone did not continue with the FED Hearing. On account of Enterprises' filing, the California Action is also stayed with respect to the entities involved in the Merger.

## VII.    Assets and Liabilities of Construction and Enterprises as of Their Respective Filing Dates

In addition to description of the secured claims against Construction set forth above, detailed information regarding the assets and liabilities of Construction can be found on its Schedules and Statement of Financial Affairs. *See* Docket Nos. 61 and 116 in Case No. 10-21171.

Detailed information regarding the assets and liabilities of Enterprises can be found on the Schedules and Statement of Financial Affairs which will be filed with respect to Enterprises in Case No. 11-20197. Additionally, information regarding Enterprises' secured claims can be found on the charts attached hereto as **Exhibit B**, which show all pre-Merger secured claims of Enterprises or assumed by Enterprises in the Merger.

In addition to the secured and priority claims detailed above, Construction owes approximately $905,998.00 of prepetition, unsecured debt. In addition to the secured claims shown on **Exhibit B**, Enterprises owes approximately $870,638.00 of unsecured debt. These amounts do not include intercompany debt, which intercompany debt is being eliminated under the Plan.

## VIII.    Plan of Reorganization

The following terms when used in the Plan shall, unless the context otherwise requires, have the following respective meanings:

1.1    "Administrative Expense" shall mean those expenses described in Section 503(b) of the Code.

1.2    "Administrative Expense Bar Date" shall mean the date that is sixty (60) days after the Effective Date. The Administrative Expense Bar Date shall apply only to Administrative Expenses that have accrued as of the Effective Date, provided, however, that the Administrative Expense Bar Date shall not be applicable to Professional Fees and Expenses regardless of when such claims accrued.

1.3    "Administrative Expense Reserve" shall mean an amount of cash equal to the amount of the Consolidated Estate's cash on the Effective Date, minus a working capital reserve determined by the Disbursing Agent and the Reorganized Debtor, which shall, on the Effective Date, be transferred by the Consolidated Entities into a segregated, interest-bearing account. The Administrative Expense Reserve, including any interest earned thereon, shall be used to pay, in whole or in part, the Allowed Claims for Administrative Expenses.

1.4    "Allowed Amount" shall mean: (a) the amount of the Claim scheduled by the Debtor if the Claim is not scheduled as disputed, contingent or unliquidated by the Debtor, no objection to that amount is filed by the Claims Objection Date and the Holder of the Claim has not timely filed a properly prepared proof of claim in an amount different than that scheduled by the Debtor; (b) the amount set forth by the Holder of a Claim in a timely filed and properly prepared proof of claim if that amount differs from the amount scheduled by the Debtor and no objection to the amount stated in the proof of claim is filed by the Claims Objection Date; (c) the amount of such Claim established by a Final Order of the Bankruptcy Court if (i) such Claim is scheduled as contingent or disputed and an objection to that amount is filed by the Claims Objection Date or (ii) the amount set forth by the Holder of such Claim in a timely filed, properly prepared proof of claim differs from the amount scheduled by the Debtor and an

objection to that amount is filed to the proof of claim by the Claims Objection Date; or (d) the amount established in the Plan or otherwise agreed to by the Debtor and the Holder of the Claim.

1.5     "Allowed Claim" shall mean, with respect to any Claim, the status of the Claim, such that (a) upon expiration of the Claims Objection Date, the Claim, whether filed or scheduled, has not been disputed or (b) with respect to disputed Claims, a Final Order allowing the Claim has been entered.

1.6     "Allowed Priority Claim" shall mean an Allowed Claim for which the Holder asserts, and is determined to be entitled to, priority under Section 507 of the Code, in an amount allowed by a Final Order of the Bankruptcy Court.

1.7     "Allowed Secured Claim" shall mean an Allowed Claim arising on or before the Filing Date that is secured by a valid Lien on Assets of one or more of the Debtors which is not void or voidable under any state or federal law, including any provision of the Code, but, pursuant to section 506 of the Code, only to the extent of the value of the Assets constituting Collateral for such Allowed Claim.

1.8     "Allowed Unsecured Claim" shall mean an Allowed Claim that is not an Allowed Priority Claim or an Allowed Secured Claim.

1.9     "Assets" shall mean any and all assets, property, property interests and property rights of the Debtors, whether tangible, intangible, vested, contingent, exclusive, joint, real, personal or mixed, that constitute property of the Consolidated Estate.

1.10     "Associates" shall mean Associates Commercial Corp., Holder of a secured claim originally against Pleasant Hill Auto, and now against Enterprises.

1.11   "<u>Avoidance Actions</u>" shall mean causes of action that are pending as of the Confirmation Date and/or which are brought after the Confirmation Date and that arise under Sections 544 through and including Section 553 of the Code.

1.12   "<u>Baldwin Pit</u>" shall mean a certain gravel pit and related real estate owned by Enterprises and located in Baldwin, Maine.

1.13   "<u>Bangor Savings</u>" shall mean Bangor Savings Bank, originally a secured creditor of GLM and Pleasant Hill Auto, and now a secured creditor of Enterprises.

1.14   "<u>Bankruptcy Court</u>" shall mean the United States Bankruptcy Court, District of Maine.

1.15   "<u>Bankruptcy Rules</u>" shall mean the Federal Rules of Bankruptcy Procedure and any applicable local rules of the Bankruptcy Court.

1.16   "<u>Bar Date</u>" shall mean the date established by the Bankruptcy Court as to each Debtor as the deadline for creditors to file proofs of claim.

1.17   "<u>Berkley</u>" shall mean Berkley Regional Insurance Company and/or Berkley Surety Group, LLC, a creditor asserting a secured claim against the Debtors.

1.18   "<u>Berkley Settlement</u>" shall mean the settlement reached between Berkley and certain of the Consolidated Entities as evidenced by a certain Loan Agreement and Promissory Note dated January 5, 2011 and under which amounts owed to Berkley are secured by a mortgage on the Standish Pits.

1.19   "<u>Blackstone</u>" shall mean Blackstone Equipment Financing LP, a creditor asserting a leasing and/or secured claim against the Debtors.

1.20   "<u>Blackstone Litigation</u>" shall mean Adversary Proceeding No. 10-02054 brought by Construction against Blackstone, as the same may be amended.

1.21    "Case" shall mean the cases commenced by the filing of a voluntary petition for relief under chapter 11 of the Code by each of Construction and Enterprises on their respective Filing Dates, to be jointly-administered.

1.22    "Caterpillar" shall mean Caterpillar Financial Services Corporation, a creditor asserting a secured claim against the Debtors.

1.23    "Caterpillar Litigation" shall mean an Adversary Proceeding to be brought by the Debtors against Caterpillar, as the same may be amended, including, without limitation, to avoid certain liens, to recover certain preferential and/or fraudulent transfers and/or to equitably subordinate certain claims and/or liens of Caterpillar.

1.24    "Claim" shall mean a claim, as such term is defined in Section 101(5) of the Code, and shall include, without limitation, all rights to payment from the Debtors, or either of them.

1.25    "Claims Objection Date" shall mean the date that is ninety (90) days after the Effective Date.  The failure to object to a Claim by the Claims Objection Date shall not constitute a waiver, acceptance or release of any Claim against a creditor, including a Claim based upon a creditor receiving preferential or fraudulent transfers avoidable or actionable under Sections 544, 547 or 548 of the Code or under applicable nonbankruptcy law.

1.26    "Code" shall mean the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*

1.27    "Confirmation Date" shall mean the date on which the Bankruptcy Court enters an order confirming the Plan.

1.28    "Confirmation Hearing" shall mean the hearing held by the Bankruptcy Court to consider confirmation of the Plan

1.29    "Confirmation Order" shall mean the order entered by the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Code.

1.30 "<u>Consolidated Entities</u>" shall mean Construction and Enterprises to the extent such entities are substantively consolidated pursuant to the Plan and for the purposes of the Plan.

1.31 "<u>Consolidated Estate</u>" shall mean the combined Assets of the Consolidated Entities as of the Confirmation of the Plan.

1.32 "<u>Construction</u>" shall mean Maietta Construction, Inc., a debtor-in-possession in the Case.

1.33 "<u>DCFS</u>" shall mean DCFS USA LLC, as successor in interest to Daimler-Chrysler Financial Services, f/k/a Daimler-Chrysler Financial Services North America, LLC f/d/b/a DC Fin Svcs, Amer., LLC and currently d/b/a Mercedes-Benz Financial Services USA LLC.

1.34 "<u>Debtor</u>" shall mean Construction or Enterprises, each a debtor-in-possession in the above-captioned Case.

1.35 "<u>Debtors</u>" shall mean Construction and Enterprises, as debtors-in-possession in the Case.

1.36 "<u>Disclosure Statement</u>" shall mean that certain joint disclosure statement filed by the Debtors in respect of the Plan and approved by the Bankruptcy Court as containing adequate information pursuant to a Final Order of the Bankruptcy Court.

1.37 "<u>Disputed Claim</u>" shall mean a Claim which either Debtor listed on its schedules as contingent, unliquidated or disputed or any Claim against any or all of the Debtors which has been the subject of a written objection filed with the Bankruptcy Court by the Claims Objection Date.

1.38 "<u>Effective Date</u>" shall mean the date that is ninety (90) days after the Confirmation Date or such later date designated by the Debtors when all conditions to the

Effective Date in Article XII of the Plan have been satisfied or waived. If an order staying confirmation of the Plan has been entered and remains in effect ninety (90) days after the Confirmation Date, the Effective Date means the first day at least five (5) business days after any such stay of the Plan is no longer effective and all conditions to the Effective Date in Article XII of the Plan have been satisfied or waived.

1.39    "Enterprises" shall mean Maietta Enterprises, Inc., a debtor-in-possession in the Case, and successor by merger to Maietta Foundations, Inc., GLM Associates, Inc., M7 Properties, LLC, and Pleasant Hill Auto Sales, Inc.

1.40    "Estate" shall mean the estate created in the Case as to each Debtor pursuant to Section 541 of the Code.

1.41    "ETrade" shall mean ETrade Bank, holder of an alleged secured claim originally against Pleasant Hill Auto and now against Enterprises.

1.42    "Exculpated Party" shall mean the Debtors, the Consolidated Estate, the Reorganized Debtor, the Estates, and their respective officers, directors, employees, managers, and professionals retained after the Filing Date and approved by the Bankruptcy Court, each in their respective capacities.

1.43    "Filing Date" shall mean July 21, 2010, as to Construction, and February 24, 2011, as to Enterprises.

1.44    "Final Order" shall mean an order of a court of competent jurisdiction with respect to which all periods for taking appeal from such order and any order of an appellate court relating to that order have expired with no appeal pending and no stay of such order being then in effect.

1.45    "Ford Credit" shall mean Ford Motor Credit Company, LLC, a creditor asserting a secured claim against Construction.

1.46    "Foundation" shall mean Maietta Foundation, Inc., a previous affiliate of the Debtors, now merged into Enterprises.

1.47    "GLM" shall mean GLM Associates, Inc., a previous affiliate of the Debtors, now merged into Enterprises.

1.48    "Holder" shall mean a creditor holding, including by assignment, a Claim against the Estate.

1.49    "HSP" shall mean Hill Street Properties, LLC, a creditor asserting a lien against Construction's personal property.

1.50    "Individual Shareholders" shall mean the individual shareholders of each and all of the Debtors.

1.51    "Initial Equipment Sale" shall mean the sale of certain equipment upon which Blackstone, Caterpillar and DCFS claimed first liens, which was completed in early February 2011 pursuant to the Order of the Bankruptcy Court dated February 7, 2011, and from which certain proceeds were distributed to Blackstone, Caterpillar and DCFS, certain proceeds are being held in escrow, and the remaining proceeds are being retained by Construction's Estate.

1.52    "IRS" shall mean the Internal Revenue Service, a creditor asserting secured and priority claims against Construction.

1.53    "Lien" shall mean any claim, interest, encumbrance, security interest, restriction, charge or assessment, of every kind, nature and description, against, in or upon property, whether recorded or unrecorded, fixed or contingent, perfected or unperfected, possessory or nonpossessory, known or unknown.

1.54    "M7" shall mean M7 Properties, LLC, a prior affiliate of the Debtors, now merged into Enterprises.

1.55    "Maine Revenue" shall mean the Bureau of Revenue, State of Maine and/or the Treasurer, State of Maine (to the extent holding tax claims of the State of Maine).

1.56    "McGoldrick" shall mean McGoldrick Brothers Blasting, holder of an alleged secured claim against Enterprises secured by a mortgage on the Baldwin Pit.

1.57    "Plan" shall mean the Debtors' Joint Plan of Reorganization Dated March 4, 2011.

1.58    "Pleasant Hill Auto" shall mean Pleasant Hill Auto Sales, Inc., a prior affiliate of the Debtors, now merged into Enterprises.

1.59    "Post-Confirmation Causes of Action" shall mean all causes of action of the Consolidated Entities, including, without limitation, Avoidance Actions, the Blackstone Litigation, the Caterpillar Litigation, the Veteran's Memorial Cemetery Litigation and the Warren Avenue Litigation.

1.60    "Priority Creditor" shall mean the owner and Holder of an Allowed Priority Claim.

1.61    "Professional Fees and Expenses" shall mean Allowed Administrative Claims of the professionals hired by the Debtors and Reorganized Debtor.

1.62    "Property" shall mean all of the Debtors', the Consolidated Estate, and the Reorganized Debtor's rights, title and interests in and to the Assets, any business conducted with respect to such Assets, and the revenue derived from such Assets or business.

1.63    "Protected Party" shall mean the Debtors, the Estates, the Reorganized Debtor, and the Consolidated Estate, in their respective capacities.

1.64    "Refinance Loan" shall mean the secured loan from Century Services, Inc.  (or any replacement lender) to the extent obtained by the Debtors, the Consolidated Entities or the Reorganized Debtor.

1.65    "<u>Reorganized Debtor</u>" shall mean the Consolidated Entities after the Effective Date, and as combined pursuant to the tax-free, state law merger described in the Plan.

1.66    "<u>Second Equipment Sale</u>" shall mean a second bulk sale of machinery and equipment on or before July 30, 2011 for the purpose of making a second pay down of the Allowed Secured Claims, if any, of Blackstone and Caterpillar; the sale will be free and clear of liens under §§363 and 1123 of the Code, with liens to attach to the proceeds.

1.67    "<u>Secured Creditor</u>" shall mean the owner and Holder of an Allowed Secured Claim.

1.68    "<u>Sovereign</u>" shall mean Sovereign Bank, holder of an alleged secured claim originally against Pleasant Hill Auto, and now against Enterprises.

1.69    "<u>Standish Pits</u>" shall mean certain gravel pits and related real estate owned by Enterprises and located in Standish, Maine.

1.70    "<u>Substantial Consummation</u>" shall have the meaning assigned to such term in Section 1101(2) of the Code.

1.71    "<u>TD Bank</u>" shall mean TD Bank as the successor to Peoples Heritage Bank and TD Banknorth and the holder of a secured claim against Enterprises, secured by liens on the Standish Pit and the Baldwin Pit.

1.72    "<u>Unclassified Claims</u>" shall have the meaning assigned to such term in Article II of the Plan.

1.73    "<u>Unsecured Creditor</u>" shall mean the owner and Holder of an Allowed Unsecured Claim.

1.74    "<u>UST Fees</u>" shall mean the quarterly fees paid and payable to the United States Trustee.

1.75 "V&E" shall mean V & E Enterprises, Inc., a creditor asserting a secured claim against the Debtors in an amount exceeding $2 million.

1.76 "Veteran's Memorial Cemetery Litigation" shall mean litigation and/or arbitration proceedings against the State of Maine and/or other parties arising out of work done by Construction in connection with the Veterans' Memorial Cemetery in Springvale, Maine.

1.77 "Warren Avenue Litigation" shall mean litigation and/or arbitration proceedings against the State of Maine and/or other parties arising out of work done by Construction in connection with a certain project on Warren Avenue, Portland, Maine.

### Classification of Claims and Interests

Each Holder of (a) a Claim against the Debtors of whatever nature, whether or not scheduled and whether unliquidated, absolute or contingent, including all claims arising from the rejection of leases and executory contracts of the Debtors, or (b) any interest in the Debtors, shall be bound by the provisions of the Plan, and all such Claims and interests are hereby classified as follows:

Unclassified Claims shall consist of (a) all Claims for the actual and necessary costs and expenses of administration of the Estate entitled to priority in accordance with Sections 507(a)(1) and 503(b) of the Code, including, without limitation, claims for Professional Fees and Expenses, and fees payable pursuant to 28 U.S.C. § 1930; and (b) claims entitled to priority under §507(a)(8) of the Code, including any claims of Maine Revenue.

2.1 Class One shall consist of all Allowed Secured Claims held by Caterpillar.

2.2 Class Two shall consist of all Allowed Secured Claims held by Blackstone.

2.3 Class Three shall consist of all Allowed Secured Claims held by the IRS.

2.4 Class Four shall consist of all Allowed Secured Claims held by Berkley.

2.5 Class Five shall consist of all Allowed Secured Claims held by V&E.

2.6     <u>Class Six</u> shall consist of all Allowed Secured Claims, if any, held by HSP.

2.7     <u>Class Seven</u> shall consist of all Allowed Secured Claims held by DCFS.

2.8     <u>Class Eight</u> shall consist of all Allowed Secured Claims held by Ford Credit.

2.9     <u>Class Nine</u> shall consist of the Allowed Secured Claims held by Gorham Savings.

2.10    <u>Class Ten</u> shall consist of the Allowed Secured Claims held by Bangor Savings against Enterprises.

2.11    <u>Class Eleven</u> shall consist of the Allowed Secured Claims held by TD Bank against Enterprises.

2.12    <u>Class Twelve</u> shall consist of the Allowed Secured Claims held by McGoldrick.

2.13    <u>Class Thirteen</u> shall consist of the Allowed Secured Claims held by TD Bank against Enterprises.

2.14    <u>Class Fourteen</u> shall consist of the Allowed Secured Claim held by Sovereign.

2.15    <u>Class Fifteen</u> shall consist of the Allowed Secured Claim held by E-Trade.

2.16    <u>Class Sixteen</u> shall consist of the Allowed Secured Claim held by Associates.

2.17    <u>Class Seventeen</u> shall consist of all Allowed Priority Claims, if any.

2.18    <u>Class Eighteen</u> shall consist of all Allowed Unsecured Claims not otherwise classified under the Plan, but shall not include any Unclassified Claims or Allowed Unsecured Claims held by Individual Shareholders.

2.19    <u>Class Nineteen</u> shall consist of Allowed Unsecured Claims held by Individual Shareholders.

2.20    <u>Class Twenty</u> shall consist of existing equity interests in either of the Debtors held by the Individual Shareholders.

<u>**Treatment of The Claims and Interests By Classes**</u>

All Claims against the Debtors as finally Allowed and all Interests in the Debtors are fully and finally satisfied in accordance with the provisions of the Plan.

Unclassified Claims against the Debtors are unimpaired:

A.    Professionals Fees and Expenses and UST Fees.   Any Allowed Unclassified Claim based on either (i) an interim or final award of compensation for services or reimbursement of expenses pursuant to Sections 330 or 331 of the Code or (ii) the obligation to pay fees under 28 U.S.C. § 1930(6) shall be paid in full (to the extent of the Allowed Amount of such Unclassified Claim) by the Debtors, on the later of (a) the Effective Date; or (b) the date any such Unclassified Claim is Allowed.

B.    Claims Pursuant to Section 507(a)(8).   Allowed Priority Claims pursuant to Section 507(a)(8) of the Bankruptcy Code shall be satisfied in full in accordance with section 1129(a)(9)(C) of the Code, or upon such terms as maybe agreed upon by the Reorganized Debtor and the Holders of such Allowed Priority Claims.

**Treatment of Claims and Interests**

3.1    Class 1 Claims are impaired.  The Class 1 Claims shall retain their Liens, to the extent determined by the Caterpillar Litigation.  Class 1 Claims will be paid as follows:

> On the later to occur of (a) the date the Class 1 Claims become Allowed Secured Claims; and (b) the conclusion of the Caterpillar Litigation, the Class 1 Claims shall be paid the amount of the net proceeds of the Initial Equipment Sale attributable to the sale of equipment upon which Caterpillar has an Allowed Secured Claim which is secured by a first Lien, to the extent not already paid to Caterpillar.  Caterpillar shall receive a secured promissory note equal to the balance then remaining, payable in equal monthly installments over a seven (7) year term, bearing interest at a fixed rate of four and one quarter percent (4.25%) per annum with the first monthly payment to be made on the 1st of the month following payment to Caterpillar from the proceeds of the Initial Equipment Sale.  To the extent the Second Equipment Sale occurs, Caterpillar shall receive a paydown equal to the amount of the net proceeds of the Second Equipment Sale attributable to the sale of equipment upon which Caterpillar has an Allowed Secured Claim which is secured by a first Lien; upon such paydown, the monthly

payments shall be reset to pay off the remaining balance in equal monthly installments over the remaining term of the promissory note (with the interest rate per annum remaining at 4.25%).

3.2     Class 2 Claims are impaired.  The Class 2 Claims shall retain their Liens, to the

extent determined by the Blackstone Litigation.  Class 2 claims will be paid as follows:

On the later to occur of (a) the date the Class 2 Claims become Allowed Claims; and (b) the conclusion of the Blackstone Litigation, the Class 2 Claims shall receive a secured promissory note equal to the balance then remaining, as determined by the Bankruptcy Court, payable in equal monthly installments over a seven (7) year term, bearing interest at a fixed rate of four and one quarter percent (4.25%) per annum with the first monthly payment to be made on the 1st of the month on the Effective Date.  To the extent the Second Equipment Sale occurs, Blackstone shall receive a paydown equal to the amount of the net proceeds of the Second Equipment Sale attributable to the sale of equipment upon which Blackstone has an Allowed Secured Claim which is secured by a first Lien; upon such paydown, the monthly payments shall be reset to pay off the remaining balance in equal monthly installments over the remaining term of the promissory note (with the interest rate per annum remaining at 4.25%).  Provided, further, that to the extent the Consolidated Entities close on the Refinance Loan, the Class 2 Claims, to the extent Allowed Secured Claims, may be paid in full at such closing, or an amount determined by the Bankruptcy Court shall be placed in escrow from the proceeds of the Refinance Loan pending the conclusion of the Blackstone Litigation, with Blackstone's Liens to attach to such escrows and such Liens to otherwise be discharged as to the Assets.

3.3     Class 3 Claims are unimpaired.  The Class 3 claims will be paid in accordance

with Section 1129(a)(9)(C) and (D), or upon such terms as may be agreed upon by the

Reorganized Debtor and the IRS, unless sooner paid as a consequence of the Refinance Loan.

3.4     Class 4 Claims are unimpaired.   The Class 4 claims shall be satisfied in

accordance with the Berkley Settlement, unless sooner paid as a consequence of the Refinance

Loan.  For avoidance of doubt, substantive consolidation of the Debtors does not in any way

impair, alter or modify any/or all of the rights or remedies of Berkley against the Debtors or the

Reorganized Debtor under or in connection with the GIA between the Debtors and Berkley

(under which Berkley underwrites bonds for the Debtors and which GIA is assumed under the

Plan), the Loan Agreement or Promissory Note entered into pursuant to the Loan Agreement. The Debtors and Reorganized Debtor acknowledge the execution of the GIA and the enforceability by Berkley of the GIA post-assumption, as well as the execution and enforceability of the Loan Agreement and Promissory Note, and reaffirm their joint and several obligations and liabilities to Berkley under such documents, which rights are unimpaired by the Plan.

3.5     <u>Class 5 Claims</u> are impaired. To the extent the Plan is confirmed, and the provisions of Article VIII are implemented in full by the Confirmation Order, the Class 5 claims shall be satisfied in full by receipt of 100% of the Equity Interests in the Reorganized Debtor.

3.6     <u>Class 6 Claims</u> are unimpaired. The Class 6 claim was paid in full prior to the Filing Date; any remaining Lien of record with respect to the Class 6 claim shall be released and discharged by entry of the Confirmation Order.

3.7     <u>Class 7 Claims</u> are unimpaired. To the extent the Class 7 claim is an Allowed Secured Claim, defaults, if any, shall be cured and such Claim shall be paid in full pursuant to existing contract terms and conditions, in accordance with Section 1124 of the Code, or satisfied in full in accordance with such terms and conditions as may be agreed upon by the Consolidated Estate (or the Reorganized Debtor) and the Holder of such Claim.

3.8     <u>Class 8 Claims</u> are unimpaired. To the extent the Class 8 claim is an Allowed Secured Claim, defaults, if any, shall be cured and such Claim shall be paid in full pursuant to existing contract terms and conditions, in accordance with Section 1124 of the Code, or satisfied in full in accordance with such terms and conditions as may be agreed upon by the Consolidated Estate (or the Reorganized Debtor) and the Holder of such Claim.

3.9     <u>Class 9 Claims</u> are unimpaired. To the extent the Class 9 claim is an Allowed

Secured Claim, defaults, if any, shall be cured and such Claim shall be paid in full pursuant to existing contract terms and conditions, in accordance with Section 1124 of the Code, or satisfied in full in accordance with such terms and conditions as may be agreed upon by the Consolidated Estate (or the Reorganized Debtor) and the Holder of such Claim.

3.10     Class 10 Claims are unimpaired.  To the extent the Class 10 claim is an Allowed Secured Claim, defaults, if any, shall be cured and such Claim shall be paid in full pursuant to existing contract terms and conditions, in accordance with Section 1124 of the Code, or satisfied in full in accordance with such terms and conditions as may be agreed upon by the Consolidated Estate (or the Reorganized Debtor) and the Holder of such Claim.

3.11     Class 11 Claims are unimpaired.  To the extent the Class 11 claim is an Allowed Secured Claim, defaults, if any, shall be cured and such Claim shall be paid in full pursuant to existing contract terms and conditions, in accordance with Section 1124 of the Code, or satisfied in full in accordance with such terms and conditions as may be agreed upon by the Consolidated Estate (or the Reorganized Debtor) and the Holder of such Claim.

3.12     Class 12 Claims are unimpaired.  To the extent the Class 12 claim is an Allowed Secured Claim, defaults, if any, shall be cured and such Claim shall be paid in full pursuant to existing contract terms and conditions, in accordance with Section 1124 of the Code, or satisfied in full in accordance with such terms and conditions as may be agreed upon by the Consolidated Estate (or the Reorganized Debtor) and the Holder of such Claim.

3.13     Class 13 Claims are unimpaired.  To the extent the Class 13 claim is an Allowed Secured Claim, defaults, if any, shall be cured and such Claim shall be paid in full pursuant to existing contract terms and conditions, in accordance with Section 1124 of the Code, or satisfied in full in accordance with such terms and conditions as may be agreed upon by the Consolidated Estate (or the Reorganized Debtor) and the Holder of such Claim.

3.14    Class 14 Claims are unimpaired.  To the extent the Class 13 claim is an Allowed Secured Claim, defaults, if any, shall be cured and such Claim shall be paid in full pursuant to existing contract terms and conditions, in accordance with Section 1124 of the Code, or satisfied in full in accordance with such terms and conditions as may be agreed upon by the Consolidated Estate (or the Reorganized Debtor) and the Holder of such Claim.

3.15    Class 15 Claims are unimpaired.  To the extent the Class 15 claim is an Allowed Secured Claim, defaults, if any, shall be cured and such Claim shall be paid in full pursuant to existing contract terms and conditions, in accordance with Section 1124 of the Code, or satisfied in full in accordance with such terms and conditions as may be agreed upon by the Consolidated Estate (or the Reorganized Debtor) and the Holder of such Claim.

3.16    Class 16 Claims are unimpaired.  To the extent the Class 16 claim is an Allowed Secured Claim, defaults, if any, shall be cured and such Claim shall be paid in full pursuant to existing contract terms and conditions, in accordance with Section 1124 of the Code, or satisfied in full in accordance with such terms and conditions as may be agreed upon by the Consolidated Estate (or the Reorganized Debtor) and the Holder of such Claim.

3.17    Class 17 Claims are impaired.   Class 17 claims, if any, shall be paid in accordance with Section 1129(a)(9)(B), or upon such terms as may be agreed upon between the Reorganized Debtor and the Holders of such Allowed Priority Claims.

3.18    Class 18 Claims are impaired.  In full and final satisfaction of the Allowed Unsecured Claims in Class 18, the Reorganized Debtor shall make annual payments to the Holders of Class 18 Claims equal to seventy percent (70%) of the Debtor's net income, as such income is determined in accordance with GAAP.  In addition, the Reorganized Debtor shall be under no obligation to make any distribution if its cash on hand at the end of the calendar year is less than $250,000.  The purpose of this limitation is to ensure that the Reorganized Debtor

has sufficient cash reserves to maintain operations, and thereby be in a position to make future payments in accordance with the Plan, if unanticipated events negatively affect the Reorganized Debtor's cash flow.  Such annual payments shall commence on the thirtieth (30th) day of the calendar year immediately following the calendar year in which the Effective Date occurs, until the earlier of (i) date on which Allowed Class 18 Claims are paid in full; or (ii) December 31, 2018.  Each calendar year shall end December 31.  Such annual payment shall be made on a pro rata basis to each Holder of an Allowed Class 18 Claim, meaning that each such person shall receive, on account of such Claim, an amount equal to the total amount to be distributed to the Holders of Allowed Class 18 Claims, times a fraction, the numerator of which is the Allowed Claim of such Holder, and the denominator of which is the total amount of Allowed Class 18 Claims.  The obligation of the Reorganized Debtor to make plan distribution and payments to Holders of Allowed Class 18 Claims shall be unsecured, and such Allowed Unsecured Claims shall be paid without interest.

3.19    Class 19 Claims are impaired.  Class 19 interests shall be waived and released as partial consideration for the relief provided in Article VIII.

3.20    Class 20 Interests are impaired.  Class 20 interests shall be cancelled.  Class 20 interests take nothing and receive no payments under the Plan.

**Interests to be Retained and Rights to be Exercised by the Debtor**

4.1    Under the Plan, the Consolidated Estate and Reorganized Debtor each retain the right to: (a) object to any and all Claims against the Consolidated Estate, including Claims for Administrative Expenses, but excluding any Claims that already have become Allowed Claims or otherwise been resolved by the Plan or pursuant to a Final Order of the Bankruptcy Court; (b) conduct any litigation in connection with such Claims; and (c) prosecute any Post-Confirmation Causes of Action.  The Reorganized Debtor shall retain ownership of all Property

and Assets not expressly returned to claimants or otherwise divested pursuant to the Plan. On or after the Effective Date, such Property and Assets, tangible and intangible, shall vest in the Reorganized Debtor free and clear of all Liens and/or Claims of creditors, except as set forth in the Plan, pursuant to Section 1141(b) of the Code. In addition, the Reorganized Debtor shall retain control over, and the exclusive ability to prosecute, settle or abandon, in its sole discretion, any or all of the Post-Confirmation Causes of Action, as a representative of the Estate and the Consolidated Estate under Section 1123(b)(3)(B).

4.2     On the Effective Date, or such other date as may be agreed upon between the Holder of any such Claim and the Debtor, the Debtor shall: (i) fund the Administrative Expense Reserve; and (ii) make the distributions to the Holders of Claims in designated Classes entitled to any payments on such date.

## Means of Execution of the Plan

5.1     Substantive Consolidation.

a)     Pursuant to the Plan and Sections 105(a), 542 and 1123(a)(5)(C) of the Code, on the Effective Date, the Debtors, and the Estates shall be substantively consolidated into the Consolidated Estate for all purposes related to the Plan, including, without limitation, the distribution of any proceeds of the Property thereof to Holders of Unclassified Claims and Holders of Claims in Classes 17 and 18, or of any other amounts, to creditors under the Plan. The substantive consolidation of the Consolidated Entities shall have the following effects: (i) all assets and liabilities of the Consolidated Entities shall be treated as though they were merged for the purposes of distribution under the Plan; (ii) all prepetition and post-petition cross-corporate guarantees of the Consolidated Entities shall be eliminated; (iii) all Claims based upon guarantees of collection, payment or performance made by one or more of the Consolidated Entities as to the obligations of any other of the Consolidated Entities or of any

other person shall be discharged, released, and of no further force and effect; (iv) any obligation of any of the Consolidated Entities and all guarantees thereof executed by one or more of the Consolidated Entities shall be deemed to be one obligation of the Consolidated Estate and the Reorganized Debtor; (v) any Claims filed or to be filed in connection with any such obligation and such guarantees shall be deemed one Claim against the Consolidated Estate and the Reorganized Debtor; and (vi) each and every claim filed in the Case shall be deemed filed against the Consolidated Estate in the then-consolidated Case and shall be deemed a single obligation of the Consolidated Estate and the Reorganized Debtor under the Plan on and after the Confirmation Date.  In connection with, and as a result of, the substantive consolidation as provided in the Plan, on the occurrence of the Effective Date, all inter-company Claims between or among the Consolidated Entities shall be released, and the Holders of such inter-company Claims shall not be entitled to, and shall not receive or retain any property or any interest in property on account of such Claims.  The substantive consolidation provided for herein shall not, other than for the purposes related to the Plan set forth herein or as otherwise expressly set forth herein, affect any of the legal and corporate structures of the Consolidated Entities, or any obligations under any executory contracts or unexpired leases assumed in the Plan or otherwise in the Case.  Substantive consolidation shall not discharge, release, affect, modify or expand the scope of any Lien or result in the perfection of any Lien against a Consolidated Entity, where such Lien was unperfected as to such entity prior to substantive consolidation.   The Plan shall serve as a motion seeking entry of an order substantively consolidating the Consolidated Entities as provided herein.

b)       In furtherance of substantive consolidation, the Debtors shall file with the Bankruptcy Court, prior to service of the Plan on all Holders of Claims, a consolidated matrix containing the complete addresses of all creditors of, and Holders of interests in, the Debtors

(the "Consolidated Matrix").  All creditors and Holders of interests in the Debtors, whether or not impaired hereunder, shall be served with the Plan, the Disclosure Statement and notice of the Confirmation Hearing.  Any such Holder whose Claim or Interest is impaired shall also be served with a ballot and shall be entitled to vote to accept or reject the Plan.

c)      On or before the date that is ninety (90) days after the Effective Date, the Debtors will merge, pursuant to a tax-free merger under state law, with Enterprises as the surviving entity and the Reorganized Debtor hereunder.  The Reorganized Debtor shall be bound by the terms of the Plan and the Confirmation Order.  The Holder of Claims in Class Five shall own one hundred percent of the voting common shares of the Reorganized Debtor, provided, however, that such Holder can elect to hold non-voting preferred shares of the Reorganized Debtor representing ninety-nine percent (99%) of the economic value of the shares in the Reorganized Debtor, in which case all shares of voting common stock in the Reorganized Debtor will be held, pro rata, by the Individual Shareholders.

5.2      Disbursing Agent.

Spinglass Management Group, LLC is hereby appointed as Disbursing Agent for all purposes under the Plan.  Counsel for Construction shall represent the Disbursing Agent and expenses of the Disbursing Agent and such counsel, on and after the Effective Date, shall be paid from the Administrative Expense Reserve.  The Disbursing Agent shall, where provided in the Plan, receive and hold the Administrative Claims Reserve, and other funds for the purpose of making disbursements thereof to Holders of Administrative Expense Claims and Allowed Claims and for the purpose, where provided in the Plan, of holding such funds in reserve for subsequent disbursements.

5.3      Funding of the Plan.

The Plan shall be funded through (a) the remaining proceeds of the Initial Equipment

Sale and (if held) the Second Equipment Sale; (b) the Consolidated Estate's Assets (including cash and cash equivalents); (c) any revenue generated by the Consolidated Estate and/or the Reorganized Debtor, including, without limitation, revenue generated from the Property; (d) the Refinancing Loan; and (e) the proceeds, if any, derived from the prosecution or settlement of the Post-Confirmation Causes of Action.  All Claims of creditors shall be satisfied solely in accordance with the Plan.

5.4     <u>Closing Agent</u>.

Vincent Maietta shall be the authorized agent of the Debtors and Reorganized Debtor, and any documents, instruments or agreements required or contemplated under the Plan to be executed and delivered by the Debtors or Reorganized Debtor shall constitute the valid and binding act of the Debtors or Reorganized Debtor, as applicable, if duly executed and delivered by Vincent Maietta.

5.5     <u>Manner of Distribution</u>.    At the option of the Reorganized Debtor, any distributions under the Plan may be made either by cash, by check drawn on a domestic bank, or by wire transfer.  Notwithstanding any other provisions of the Plan to the contrary, no payment of fractional cents will be made under the Plan.  Funds will be issued to Holders entitled to receive a distribution of cash in whole cents (rounded to the nearest whole cent when and as necessary).

5.6     <u>De Minimis Distributions</u>.    "De Minimis Distributions" shall refer to any distribution of less than Ten Dollars ($10.00).  All De Minimis Distributions will be held by the Reorganized Debtor for the benefit of the Holders of Allowed Claims entitled to De Minimis Distributions.  When the aggregate amount of De Minimis Distributions held by the Disbursing Agent for the benefit of a Holder exceeds $50.00, the Reorganized Debtor will distribute such De Minimis Distributions to such Holder.  If, at the time that the final distribution under the

Plan is to be made, the De Minimis Distributions held by the Reorganized Debtor for the benefit of a Holder is less than $50.00, such funds shall not be distributed to such Holder, but rather, shall vest in the Reorganized Debtor and be distributed to other Holders of Allowed Claims in accordance with the terms of the Plan.

5.7     <u>Delivery of Distributions</u>.     Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made by the Debtor: (i) at the addresses set forth on the proofs of claim filed by such Holders (or at least known addresses of such Holder if no motion requesting payment or proof of claim is filed or the Reorganized Debtor has been notified in writing of a change of address); (ii) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtor after the date of any related proof of claim; or (iii) at the addresses reflected on the Consolidated Matrix if no proof of claim has been filed and the Reorganized Debtor has not received a written notice of a change of address.

5.8     <u>Undeliverable Distributions</u>.     If payment or distribution to any Holder of an Allowed Claim under the Plan is returned for lack of a current address for the Holder or otherwise, the Reorganized Debtor shall file with the Bankruptcy Court the name, if known, and last known address of the Holder and the reason for its inability to make payment.  If, after the passage of ninety (90) days, the payment or distribution still cannot be made, the payment or distribution and any further payment or distribution to the Holder shall be distributed to the Holders in the appropriate Class or Classes, and the Allowed Claim shall be deemed satisfied to the same extent as if payment or distribution had been made to the Holder of the Allowed Claim.

5.9     <u>Setoffs and Recoupments.</u>     The Reorganized Debtor may, pursuant to Sections 502(h), 553 and 558 of the Bankruptcy Code or applicable non-bankruptcy law, but shall not be required to, set off against or recoup from any Claims on which payments are to be made

pursuant to the Plan, any claims or causes of action of any nature whatsoever, including Post-Confirmation Causes of Action that are proven valid that the Reorganized Debtor may have against the Holder of such Claim; provided, however, that neither the failure to effect such offset or recoupment nor the allowance of any Claim shall constitute a waiver or release by the Reorganized Debtor or the Consolidated Estate of any right of setoff or recoupment that the Reorganized Debtor or the Consolidated Estate may have against the Holder of such Claim, nor of any other claim or cause of action.

5.10    Distributions in Satisfaction; Allocation.  Except for the obligations expressly imposed by the Plan and the property and rights expressly retained under the Plan, if any, the distributions and rights that are provided in the Plan shall be in complete satisfaction and release of all Claims against, liabilities in, Liens on, obligations of and Interests in the Debtor, the Estate, the Consolidated Estate, the Reorganized Debtor, the Assets and Property, whether known or unknown, arising or existing prior to the Effective Date.

5.11    Cancellation of Notes and Instruments.  As of the Effective Date, except to the extent otherwise provided in the Plan, all notes, agreements and securities evidencing Claims and Interests and the rights thereunder of the Holders thereof shall, with respect to the Consolidated Entities, be cancelled and deemed null and void and of no further force and effect, and the Holders thereof shall have no rights against the Debtor, the Estate, the Consolidated Estate or the Reorganized Debtor, and such instruments shall evidence no such rights, except the right to receive the distributions provided for in the Plan.

5.12    No Interest on Claims.  Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a postpetition agreement in writing between the Debtor or the Reorganized Debtor and a Holder of a Claim and approved by an order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claim, and no Holder of a Claim

shall be entitled to interest accruing on or after the Filing Date on any Claim. In addition, and without limiting the foregoing, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

5.13    Amounts Distributed by the Reorganized Debtor.  Any funds recovered by the Reorganized Debtor and not required for the expenses of pursuing such recovery shall be distributed to Holders of Claims and Interests in Classes One through Nineteen, inclusive, in accordance with the priorities established by the Plan.

5.14    Cram Down.  In the event that any class allowed to vote is deemed impaired under the Plan and refuses to accept the terms of the Plan, the Debtor shall and hereby does move the Bankruptcy Court to confirm the Plan pursuant to Section 1129(b) of the Code.  All Claims of creditors and the rights of all Holders of equity interests in the Consolidated Entities shall be satisfied solely in accordance with the Plan.

**Executory Contracts and Unexpired Leases**

6.1    Except as otherwise provided in the Plan, the Debtor and the Consolidated Estate shall, on the Confirmation Date, be authorized to assume all unexpired leases and executory contracts of the Debtors, except any unexpired leases or executory contracts for which a motion to reject is filed prior to the Confirmation Date, without the payment of any cure or other amounts pursuant to Section 365(b)(1) of the Code, and to the extent required by the Code, the Plan shall constitute a motion for such relief.  Notwithstanding the foregoing, if an executory contract or unexpired lease has previously been assumed, assumed and assigned, or rejected by the Debtor pursuant to a Final Order of the Bankruptcy Court, then such order shall continue in full force and effect and nothing in the Plan shall alter the terms of any such order.

## IX.     Feasibility of the Plan

Attached hereto as **Exhibit C** are projections for the period September 2011 through September 2015.  The projections have been prepared by the Debtor's management, with the assistance of Spinglass, and represent an estimate of the Debtor's future financial performance.  The assumptions underlying those projections are attached to the projections and should be reviewed in connection therewith.  The attached projections demonstrate that the proceeds of certain equipment sales and certain operating revenues should be adequate to pay the projected payments to Allowed Claims, including payment in full to administrative claimants and of the distribution to general, unsecured claims, as provided under the Plan.

Additionally, the Debtors anticipate that they will obtain additional funding going forward, including, but not limited to a refinancing loan from Century Services (USA), Inc. ("Century").  However, the Plan is not dependent on such additional funding.  Accordingly, the Plan is feasible and will not likely be followed by the liquidation of, or need for, further reorganization of the Debtors.

## X.     Risk Factors

Certain factors create risk that the Plan will fail, or that projected payments will not be achieved.  Such factors include, but are not limited to:

(a)     Projected revenues are dependent upon the Debtors obtaining future construction projects and such projects being as profitable as projected; such projects may not be obtained or may not be as profitable as projected;

(b)     The Debtors may not receive financing from Century;

(c)     The Debtors may not sell its equipment for as much as anticipated or offered; and

(d)     Claims may be higher in aggregate amount than anticipated by the Debtors.

# XI.    Substantive Consolidation

As noted above, the Plan is premised on the limited substantive consolidation of Construction and Enterprises. Substantive consolidation can generally be described as the "pooling [of] the assets of, and claims against, [multiple entities]; satisfying liabilities from the resultant common fund; eliminating inter-company claims; and combining the creditors of the two companies for purposes of voting on reorganization plans," and for purpose of distribution.[4]

Courts have articulated a number of different tests to determine when substantive consolidation is appropriate and will be ordered, most of which are variations on the three most widely accepted tests:

(1)    **The Auto-Train Test.** This test balances the benefits of the proposed consolidation against the harm inflicted on objecting parties. Drabkin v. Midland-Ross Corporation (In re Auto-Train Corporation, Inc.), 810 F.2d 270, 276 (D.C. Cir. 1987). Under this analysis, "[t]he proponent must show not only a substantial identity between the entities to be consolidated, but also that consolidation is necessary to avoid some harm or realize some benefit." Id. If a creditor shows that it relied on the separate credit of one of the entities and that it will be prejudiced, "the court may order consolidation only if it determines that the demonstrated benefits of consolidation 'heavily' outweigh the harm." Id.

(2)    **The Augie/Restivo Test.** The Augie/Restivo test requires courts to consider two separate factors: "(i) whether creditors dealt with the entities as a single economic unit and 'did not rely on their separate identity in extending credit' . . . or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." Augie/Restivo, 860 F.2d at 518. ([Internal citations omitted].).

(3)    **The Owens Corning Test.** This test states that substantive consolidation is only appropriate where, with respect to the debtors, it can be shown that "(i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." Owens Corning, 419 F.3d at 211.

The First Circuit approved substantive consolidation of multiple debtors in Woburn

---

[4] See, e.g., Union Savings Bank v. Augie/Restivo Baking Company, LTD (In re Augie/Restivo Baking Company), 860 F.2d 515, 518 (2d Cir. 1988).

Associates v. Kahn (In re Hemingway Transport, Inc.), 954 F.2d 1, 12 (1st Cir. 1992), in which the First Circuit applied the Auto-Train factors. *See* Logistics Information Systems, Inc. v. Braunstein (In re Logistics Information Systems, Inc.), 432 B.R. 1, 11 (D. Mass. 2010) (concluding same).

A bankruptcy court can order less than complete consolidation. First National Bank v. Giller, 962 F. 2d 796, 799 (8th Cir. 1992); James Talcott, Inc. v. Wharton (In re Continental Vending Machine Corp.), 517 F. 2d 997, 1001 (2nd Cir.1975) *cert. denied*, 424 U.S. 913 (1976). A court can approve a plan of reorganization that substantially consolidates the debtors' estates but provides that secured creditors' claims will not be elevated or improved as a result. Continental Vending, 517 F. 2d at 1001. *See also*, In re Jennifer Convertibles, Inc., 2011 WL 350507 at *7 (Bankr. S.D.N.Y. Feb. 4, 2011). "[S]ubstantive Consolidation is a flexible concept and…a principal question is whether creditors are adversely affected by consolidation and if so, whether the adverse affect can be eliminated." Id. For example, providing for payment in full of affected creditors mitigates any adverse impact. Id. at *9.

The Debtors can establish cause for substantive consolidation under any one of these three tests listed above. As noted above, the affairs of the Debtors (and the prior Affiliates) were and remain so interconnected and entangled that consolidation benefits creditors of Construction and Enterprises. Sorting out which assets equitably belong to Construction and which belong to Enterprises, if possible at all, would be costly and time-consuming, as would valuing such assets, and would produce at best an imperfect and imprecise result. Incurring that expense would result in a lower dividend to all creditors with no assurance of a better or more just result at the conclusion. Accordingly, under any of the three tests described above, substantive consolidation is warranted.

The Plan also provides for less than full consolidation; the claims of secured creditors

are unaffected, neither expanded or reduced.  Each secured lender has the same liens as it entered the Case with, and is able to look to the same additional assets.  The lot of priority and unsecured creditors is improved; the cash to pay such claims comes from all of the consolidated assets and businesses, rather than only Construction or Enterprises.

## XII.   Plan Alternatives and Liquidation Analysis

As set forth in the Plan, the over $2 million in secured debt owed to V&E by the Debtors will be converted into equity in the reorganized entity, thereby allowing for the elevation of liens of subordinated secured creditors, as well as permitting a dividend to such creditors and unsecured creditors.  V&E will not convert its secured debt to equity except pursuant to the Plan, and such debt would not be converted to equity if the Case were converted to a case under Chapter 7.

The Debtors believe that the only currently available alternatives to the Plan are: (1) the conversion of the Debtors' cases to cases under chapter 7; and (2) a plan which does not substantively consolidate Construction and Enterprises.  Both of these alternatives would significantly increase administrative costs, reduce or eliminate altogether distributions to subordinated secured, priority and general unsecured creditors, and significantly delay distributions.  Because the V&E Allowed Secured Claims would remain in place under both alternative scenarios, both scenarios are far less favorable than the Plan.

A.    Conversion

Critically, in a chapter 7 case, the V&E secured debt would not be converted to equity. If this obligation had to be satisfied in a chapter 7 liquidation, nothing would be available to distribute to priority and unsecured claims.

The conversion of the Debtors' cases to cases under chapter 7 would also require the appointment of a chapter 7 trustee by the Bankruptcy Court.  Conversion would add a new layer

of administrative expenses for the fees of the chapter 7 trustee, any professionals employed by the trustee, and any costs of liquidating the assets, such as auctioneers' commissions and the costs of advertising and sale. The trustee and any professionals employed by the trustee would have to spend significant time familiarizing themselves with the Debtors' cases, thereby greatly increasing the administrative costs to the Debtors' estates and significantly delaying distributions to creditors. Additionally, sale of the Debtors' assets at liquidation value would generate returns at far less than fair market or going-concern value; fixed assets would likely sell for sixty percent of fair market value or less.

To calculate what the holders of each impaired class of creditors would receive if the Debtors were liquidated, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from a liquidation of the Debtors' assets under chapter 7 of the Code (the "Liquidation Value"). The Bankruptcy Court then must reduce the Liquidation Value by (a) claims of secured creditors to the extent of the value of their collateral; (b) the cost of liquidation, including costs of sale such as auctioneers' commissions; (c) the chapter 7 trustee's and his professionals' fees and costs of administration; and (d) all other administrative and priority expenses of the Debtors' estates. All priority claims (e.g., taxes) would then be paid. The remaining balance, if any, would be available for distribution to unsecured creditors.

In light of the Debtors' significant secured debt, including the V&E Debt, and the administrative expenses which would be incurred upon conversion, certain subordinated secured creditors, such as the IRS, priority and unsecured creditors would receive nothing in a chapter 7 case.

B.     Plan without Substantive Consolidation

Filing and confirming a plan not based on substantive consolidation of Construction and Enterprises would be prohibitively expensive. First, litigation would be required in order to

allocate "ownership" of the assets as between Construction and Enterprises, which may in any event be impossible to accurately determine. The legitimacy and amount of intercompany claims would also have to be determined by litigation. Such a process would take months and generate hundreds of thousands of dollars of administrative expense claims and the resulting reallocation of values would be imperfect at best. The Plan will instead ensure that secured, priority and unsecured creditors, and all administrative claims, are paid in full.

## XIII.  Governance and Maintenance

The Initial Board of Directors of the Reorganized Debtor shall consist of Vincent Maietta. On and after the Effective Date, V&E may appoint additional directors and officers, in its sole discretion, but in accordance with applicable non-bankruptcy law.

## XIV.  Post-Confirmation Causes of Action

In addition to the adversary proceedings detailed above, the Post-Confirmation Causes of Action may include claims against creditors for prepetition preferential transfers, or "preferences." Under § 547(b) of the Code, the Debtors may recover payments and other transfers made to creditors as follows:

Except as provided in subsection (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—
(A) on or within 90 days before the date of the filing of the petition; or
(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The Debtors made various payments to creditors within the ninety day period. Under § 547 of the Code, however, creditors receiving such payments may have defenses which would prevent recovery of such payments, including, without limitation, that such payments were in the ordinary course of business or that such creditors provided additional goods or services after the payments were made. No analysis of avoidable preferences has been done, as of the date of this Disclosure Statement, except the analysis with respect to payments made to Caterpillar. Prior to Confirmation, such an analysis will be prepared, and a list of possible avoidance actions, if any, filed with the Bankruptcy Court as a supplement to the Plan. All such actions are preserved under the Plan.

## XV. Effect of Confirmation

Discharge. Confirmation of the Plan shall discharge the Debtors from all Claims arising before the Confirmation Date, except as expressly provided herein.

Injunction. Except as otherwise expressly provided in the Plan, the documents executed pursuant to the Plan, or the Confirmation Order, on and after the Effective Date, all persons and entities who have held, currently hold or may hold Claims against or interests in the Debtors or the Consolidated Estate that arose prior to the Effective Date (including, but not limited to, states and other governmental units, and any state official, employee, or other entity acting in an individual or official capacity on behalf of any state or other governmental units) are permanently enjoined from: (i) commencing or continuing in any manner, directly or indirectly, any action or other proceeding against any Protected Party or any property of any Protected Party; (ii) enforcing, attaching, executing, collecting, or recovering in any manner, directly or indirectly, any judgment, award, decree, or order against any Protected Party or any property of

any Protected Party; (iii) creating, perfecting, or enforcing, directly or indirectly, any lien or encumbrance of any kind against any Protected Party or any property of any Protected Party; (iv) asserting or effecting, directly or indirectly, any setoff, right of subrogation, or recoupment of any kind against any obligation due to any Protected Party or any property of any Protected Party; and (v) any act, in any manner, in any place whatsoever, that does not conform to, comply with, or is inconsistent with any provisions of the Plan. Any Person or entity injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator. Nothing contained in the Plan shall prohibit the Holder of a Disputed Claim from litigating its right to seek to have such Disputed Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Holder of such Disputed Claim of any of the obligations of the Debtor or the Reorganized Debtor under the Plan. The Confirmation Order shall also constitute an injunction enjoining any Person from any property of any Protected Party based on, arising from or related to any failure to pay, or make provision for payment of, any amount payable with respect to any Priority Claim on which the payments due under the Plan have been made or are not yet due under the Plan.

Term of Injunctions. Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Case by orders of the Bankruptcy Court, under Sections 105 or 362 of the Bankruptcy Code, the Plan, or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until entry of the Final Decree.

Exculpation. On and after the Effective Date, none of the Exculpated Parties shall have or incur liability for, and each Exculpated Party is hereby released from, any claim, cause of action or liability to any other Exculpated Party, to any Holder of a Claim or Interest, or to any

other party in interest, (a) pertaining to the commencement of the Case or (b) in connection with the formulation, negotiation and/or pursuit of the Plan, the consummation of the Plan, and/or the administration of the Plan and/or the property to be distributed under the Plan, except, in either case, for claims, causes of action or liabilities arising from the gross negligence, willful misconduct or fraud of any Exculpated Party, in each case subject to determination of such by Final Order of a court competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan and such reasonable reliance shall form an absolute defense to any such claim, cause of action, or liability. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections and benefits of Section 1125(e) of the Code. Except as provided in Section 8.5 of the Plan, no provision of the Plan or Disclosure Statement shall be deemed to act or release any claims, causes of action or liabilities that the Debtors, the Reorganized Debtor, the Consolidated Estate or the Estate may have against any person or entity for any act, omission, or failure to act that occurred prior to the Filing Date of the Case, nor shall any provision of the Plan be deemed to act to release any Post-Confirmation Causes of Action.

<u>Temporary Injunction Regarding Claims Against Individual Shareholders</u>

In consideration of the conversion of the V&E secured debt to equity in the Reorganized Debtor, as well as the waiver of claims of the Individual Shareholders, and provided that there is no default with regard to the payments required by the Plan as to any class of Allowed Claims, the Confirmation Order shall temporarily enjoin all entities including, but not limited to, all creditors, claimants, parties-in-interest, investors and Holders of all Claims and Interests of or against the Individual Shareholders, from asserting any Claims or causes of action against the Individual Shareholders, including, without limitation, in their capacity as

guarantors, co-makers, or responsible parties of the obligations of, or co-debtors with, any or all of the Debtors, provided, however, that upon such default, if any, under the Plan, unless the Bankruptcy Court, upon appropriate pleading, orders otherwise, such injunction shall dissolve upon further order of the Bankruptcy Court adjudicating that such a default exists.  Until such default and such order, the Consolidated Estate and the Reorganized Debtor will also forbear from pursuing any Claims against the Individual Shareholders, if any.  Upon completion of satisfaction of all Claims as required by the Plan, any and all Claims against the Individual Shareholders held by creditors, claimants, parties-in-interest, investors and/or Holders of Claims and Interests, if any, shall be permanently released and discharged, provided, however, that the relief provided by this provision shall be conditioned upon execution of satisfactory tolling and negative pledge agreements by the Individual Shareholders, to the benefit of all such Holders of Claims against the Debtors, the Consolidated Estates or the Reorganized Debtors, or any of them, such that any and all such Claims, if any, against the Individuals Shareholders held by such Holders are preserved pending completion of  all payments under the Plan.

## XVI.  Income Tax Consequences

The federal, state, and local tax consequences of the Plan may be complex and, in some cases, uncertain.  Such consequences may also vary based upon the individual circumstances of each holder of a claim or interest.  **ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN.  THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR, AND SHALL NOT BE DEEMED TO CONSTITUTE, ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN.**  Any federal or state withholding taxes or other amounts required to be withheld under any applicable law shall be deducted and withheld

from any distributions under the Plan.

## XVII.  **Retention of Jurisdiction**

After the Confirmation Date, the Bankruptcy Court shall retain exclusive jurisdiction with respect to the following matters:

a.  To adjudicate all controversies concerning the classification or allowance of any Claim, including any Administrative Claim or Claim arising from any environmental liability;

b.  To hear and determine all Claims arising from rejection or any executory contract or unexpired lease and to consummate the rejection and termination thereof;

c.  To liquidate damages in connection with any disputed, contingent or unliquidated Claims;

d.  To adjudicate all Claims to or ownership of any Property of the Debtors or in any proceeds thereof arising prior to and after the Effective Date;

e.  To adjudicate all Claims or controversies arising out of any purchases, sales or contracts made or undertaken by the Debtors prior to the Effective Date;

f.  To make such orders as are necessary and appropriate to construe or effectuate the provisions of the Plan;

g.  To hear and determine any and all Post-Confirmation Causes of Action, including, without limitation, any and all avoidance actions;

h.  To hear and determine any and all applications of professional persons for allowance of compensation and/or reimbursement of expenses and all other claims for Professional Fees and Expenses and/or Administrative Expenses which may be pending on, or made after, the Confirmation Date;

i. To adjudicate any and all motions, adversary proceedings and litigated matters pending on the Confirmation Date or filed thereafter within any applicable statutory period;

j. To adjudicate any and all controversies and disputes arising under, or in connection with, the Plan or any order or document entered or approved by the Bankruptcy Court in connection with the Debtors, the Case or any controversy or dispute which may affect the ability of the Debtors, the Consolidated Estate or the Reorganized Debtor to implement or fund the Plan;

k. To determine the value of the Property for any purpose, including the assessment, imposition or collection of any real property, personal property or other *ad valorem* taxes;

l. To enter a final decree in the Case; and

m. To hear and determine all such other matters as the Bankruptcy Court in its reasonable discretion shall deem appropriate.

**XVIII. <u>Voting to Accept or Reject the Plan</u>**

If you are entitled to vote, enclosed with this Disclosure Statement is a ballot for your use in voting to accept or reject the Plan. The Debtors encourage you to vote to accept the Plan. In order for your vote to count, your properly completed and executed ballot must be received no later than 5:00 p.m. (Eastern Standard Time) on _____ __, 2011 at the offices of the Debtors' respective counsel:

> Robert J. Keach, Esq.
> Bernstein, Shur, Sawyer & Nelson P.A.
> 100 Middle Street
> P.O. Box 9729
> Portland, ME 04104

George J. Marcus, Esq.
Marcus, Clegg & Mistretta, P.A.
One Canal Plaza
Suite 600
Portland, ME 04101

**Submission of ballots by facsimile (fax) is _not_ permitted; submission of ballots by e-mail is _not_ permitted.**

**EACH CREDITOR SHOULD NOTE THAT IF ANY CLASS OF CLAIMS SHOULD FAIL TO ACCEPT THE PLAN BY THE REQUISITE MAJORITY, THE BANKRUPTCY COURT MAY NONETHELESS ENTER AN ORDER CONFIRMING THE PLAN. THE REQUIREMENTS FOR OBTAINING SUCH AN ORDER ALLOW THE BANKRUPTCY COURT TO ENTER SUCH AN ORDER IF, AFTER NOTICE AND A HEARING, THE BANKRUPTCY COURT FINDS THAT THE PLAN DOES NOT DISCRIMINATE UNFAIRLY AND IS FAIR AND EQUITABLE WITH RESPECT TO ANY IMPAIRED CLASS OF CLAIMS OR INTERESTS WHICH HAS NOT ACCEPTED THE PLAN. IF ANY CLASS OF CLAIMS FAILS TO ACCEPT THE PLAN BY THE REQUISITE MAJORITY, THE DEBTORS SHALL SEEK THIS TREATMENT.**

## XIV. <u>Conclusion</u>

The Debtors submit that the Plan complies in all respects with chapter 11 of the Code, and recommends to holders of claims who are entitled to vote on the Plan that they vote to accept the Plan.

Dated: March 4, 2011

MAIETTA CONSTRUCTION, INC.

Debtor and Debtor-in-Possession

By:     <u>/s/      *Vincent A. Maietta*   </u>
          Name: Vincent A. Maietta
          Title: President

MAIETTA ENTERPRISES, INC.

Debtor and Debtor-in-Possession

By:     /s/      *Vincent A. Maietta*
        Name: Vincent A. Maietta
        Title: President