# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

In re:

**MAIETTA CONSTRUCTION, INC.**

and

**MAIETTA ENTERPRISES, INC.**

        **Debtors.**

**Chapter 11**

**Case Nos. 10-21171 and 11-20197**

**Jointly Administered**

## JOINT MOTION FOR ORDER: (I) APPROVING POST-PETITION BORROWING BETWEEN MAIETTA CONSTRUCTION, INC., MAIETTA ENTERPRISES INC. AND COASTAL REALTY CAPITAL; AND (II) DETERMINING THAT BLACKSTONE EQUIPMENT FINANCING, LP IS ADEQUATELY PROTECTED

Maietta Construction, Inc. ("Construction") and Maietta Enterprises, Inc. ("Enterprises"), the above-captioned debtors and debtors in possession (together, the "Debtors"), hereby move this Court for entry of an Order (the "Motion"): (a) approving the terms of a post-petition borrowing by and between the Debtors and Coastal Realty Capital ("Coastal"); and (b) determining that Blackstone Equipment Financing, LP ("Blackstone") is adequately protected. In support of this Motion, the Debtors state as follows:

### I.    Introduction and Summary of Loan Terms in Accordance with Federal Bankruptcy Rule 4001(c)(1)

1.    By this Motion, the Debtors seek, among the other relief sought herein, to enter into a post-petition financing transaction with Coastal pursuant to which certain parcels of real property upon which Blackstone currently holds a first priority mortgage would be pledged to Coastal to secure the loan made by Coastal to the Debtors (the "Post-Petition Loan"). If the Debtors are authorized to enter into the Post-Petition Loan, the Post-Petition Loan would be

1

secured by a priming lien, granted under section 364(d) of the Bankruptcy Code, on the real property identified below. Blackstone would retain its mortgages on two of the three parcels of real property at issue, however, Blackstone's position on these two parcels would be subordinated to the Post-Petition Loan.

2.     More specifically, the Post-Petition Loan will be under the following terms (among others set forth in the Term Sheet dated April 28, 2011, a true and correct copy of which is attached hereto as **Exhibit A** and which is incorporated herein by reference):

(a)     The loan amount shall be **$475,000.00**.  [**Exhibit A**, p. 1].

(b)     The interest rate is fixed at thirteen percent (13.90%) for the six month term of the loan.  [**Exhibit A**, p. 1].

(c)     The primary security for the loan will be the real property identified below (and certain non-Debtor assets).

3.     Under section 364(d) of the Bankruptcy Code, in order to obtain a priming lien, the Debtors are required to adequately protect the interests of Blackstone.  Based on Blackstone's own testimony at a hearing on a motion for relief from stay filed by Blackstone, the Debtors believe that Blackstone will contend that it is owed at this juncture approximately **$650,000.00**.  The Debtors, in turn, believe that Blackstone is owed at most approximately **$332,000.00** plus reasonable fees and costs (the calculations used to derive this number are set forth in detail in the summary judgment motion filed by Construction against Blackstone in the adversary proceeding pending between the parties).  Contemporaneously with the filing of this Motion, the Debtors are filing a motion seeking to sell certain pieces of heavy equipment pledged to Blackstone (the "Sale Motion").  Pursuant to the terms of the Sale Motion, Blackstone will receive approximately **$275,000.00** from the sale upon entry of an order approving the Sale Motion.  After the pay down from the sale, the Debtors contend that Blackstone will be owed

only about **$60,000.00**, whereas Blackstone will likely claim that it is still owed another **$375,000.00**. Regardless of the amount owed, Blackstone is adequately protected. After the sale, Blackstone will still hold a first priority position on titled vehicles and heavy equipment with a **forced sale liquidation** value of **$570,000.00**. Additionally, Blackstone will hold a second priority mortgage on real property – behind only the Post-Petition Loan - which had a value in 2009 of **$1,000,000.00**[1] and will also hold a first-priority mortgage on another parcel of real property appraised in 2009 for **$660,000.00**. From this, even assuming Blackstone is owed what it thinks it's owed, it is over secured by roughly six to one.

## II.    Jurisdiction

4.      On July 21, 2010, Construction filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On February 24, 2011, Enterprises also filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.      By an Order dated March 18, 2011, this Court ordered that the Debtors' cases be jointly administered for procedural purposes only.

6.      The Debtors continue to operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in either of the Debtors' cases, and no official committee has been appointed or designated.

7.      This Court has jurisdiction to entertain this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

8.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] This appraisal includes a small parcel of real property located the end of Boysenberry Lane, South Portland, Maine. The Debtors do not believe that this parcel has any significant value.

### III. Background

#### A. The Transaction with Blackstone

9.    Prior to the respective petition dates of the Debtors' bankruptcies, in the fall of 2009, the Debtors entered into a transaction with Blackstone pursuant to which Blackstone advanced **$700,000.00** for the benefit of the Debtors, and the Debtors (and certain guarantors) pledged, among other assets, certain titled vehicles, certain pieces of heavy equipment and certain parcels of real property to Blackstone in order to secure the obligations to Blackstone. The real property pledged in relation to the Blackstone transaction consists of the following three (3) parcels: (a) the approximately 25.4 acres of property generally located at Sawyer Road, Cape Elizabeth, Maine and owned by Vincent Maietta (the "Sawyer Road Property"); (b) the property generally located at 77 Gary L. Maietta Parkway, South Portland, Maine owned by Louis B. Maietta (the "Parkway Property"); and (c) the property generally located at 150 Pleasant Hill Road and Highland Avenue, Scarborough, Maine owned by Enterprises (the "Enterprises Property" and, together with the other real property identified in this paragraph, the "Real Property").

10.    In relation to the Blackstone transaction, the Debtors executed those certain Commercial Lease Agreements dated on or about October 13, 2009 (among other documents) ("Blackstone Documents").  Pursuant to the terms of the Blackstone Documents, the Debtors were obligated to make payments to Blackstone in the amount of **$19,641.93** per month for a period of fifty-two (52) months.  At the expiration of the fifty-two (52) month term, the Debtors were contractually obligated (through the preemptive exercise of a purchase option) to make an additional eight (8) monthly payments to Blackstone, at which point, the collateral pledged to

secure the obligations to Blackstone would be returned to the Debtors (although the Real Property would be released at certain benchmarks identified in the Blackstone Documents).

## B. Events after the Petition Date

11.     After the petition date of the Construction filing, on October 1, 2010, Blackstone filed a motion for relief from stay and for other relief in the Construction bankruptcy proceeding (the "Blackstone Motion for Relief").  [D.E. 74].

12.     Construction objected to the Blackstone Motion for Relief and, after an evidentiary hearing held on January 7, 2011, this Court granted the Blackstone Motion for Relief.  The order granting the Blackstone Motion for Relief is currently the subject of appeal filed by Construction.

13.     At the hearing on the Blackstone Motion for Relief, Frank Freer, one of the principals of Blackstone, testified that the total amount owed to Blackstone by the Debtors as of January 7, 2011 was approximately **$975,000.00**.  This amount was calculated as follows (all as more specifically set forth on Joint Exhibit B in relation to the Blackstone Motion for Relief, a true and correct copy of which is attached hereto as **Exhibit B**, and as elaborated upon in the testimony of Frank Freer offered in relation to the Blackstone Motion for Relief):

    (a)    **$923,170.71** (calculated by taking the monthly lease payment and multiplying that number by the remaining forty seven (47) payments due under the Blackstone Documents)

    (b)    **Plus $84,460.29** (consisting of four monthly payments with late fees)

    (c)    **Plus $19,148.71** (consisting of miscellaneous charges as set forth on **Exhibit B**)

    (d)    **Plus $42,824.34** (consisting of an estimate of legal fees through January 7, 2011)

(e) **Minus $45,962.12** (accounting for a six percent (6%) discount for early payment in the event the Debtors made an early repayment of the obligations)

(f) **Minus $48,641.93** (consisting of unapplied cash being held by Blackstone)

**$975,000.00 Total**

14.     Approximately one month after the hearing on the Blackstone Motion for Relief, on February 7, 2011, this Court approved the sale of certain titled vehicles and certain pieces of heavy equipment upon which Blackstone held an interest (the "First Sale of Equipment").  The First Sale of Equipment generated net sale proceeds to Blackstone in the amount of **$258,861.83**. Additionally, on April 6, 2011, this Court approved the sale of certain additional titled vehicles and pieces of heavy equipment (the "Second Sale of Equipment") upon which Blackstone held an interest.  The Second Sale of Equipment generated net sale proceeds to Blackstone in the amount of **$86,050.00**.

15.     As a result of these pay downs, using Blackstone's own numbers concerning the amount owed to Blackstone as of January 7, 2011, Blackstone was owed, at most, **$630,088.17** as of January 7, 2011.  Certain additional amounts may be owed for attorneys' fees and costs arising under the Blackstone Documents from January 7, 2011 forward.

16.     As noted above, contemporaneously with the filing of this Motion, the Debtors have filed a third sale motion seeking the authority from this Court to sell additional pieces of heavy equipment upon which Blackstone asserts an interest (the "Third Sale of Equipment"). Under the terms of the Third Sale of Equipment, Blackstone will receive a guaranteed payment of approximately **$275,000.00** from the auction company virtually immediately upon entry of an Order approving the sale and, upon the sale occurring in June of 2011, may receive an additional approximately **$100,000.00** as a result of the 90/10 split of proceeds between the Debtors and the

auction company. Setting aside the upside that may result at the auction, once the payment of approximately **$275,000.00** is made to Blackstone, using Blackstone's own numbers, the obligations to Blackstone will be reduced to approximately **$355,000.00** (again, the Debtors contend that Blackstone will be owed only about **$60,000.00** after the payment of the **$275,000.00** from the Third Sale of Equipment).

        **C.**      **The Pending Refinancing Transaction with Coastal**

17. After the petition dates of the Debtors' filings, the Debtors began negotiations with Coastal about Coastal providing post-petition financing needed to fund certain of the Debtors' operating costs. As a result of these negotiations, as noted above, on April 28, 2011, the Debtors received the Term Sheet outlining the terms of a refinancing for **$475,000.00**.

18. The collateral for the Post-Petition Loan will be the Parkway Property and the Enterprises Property (among certain other non-Debtor collateral). The Parkway Property is currently owned by Louis Maietta, Sr. and is subject only to the mortgage held by Blackstone. The Parkway Property will be assigned to Construction subject to the Blackstone mortgage, provided however that, by this Motion, Construction seeks to prime the Blackstone mortgage with a mortgage granted to Coastal. By this Motion, Enterprises also seeks to prime the Blackstone mortgage on the Enterprises Property.

19. The remaining obligations owed to Blackstone will be adequately protected by the following:

      (a)    Blackstone's first priority position on certain titled vehicles and pieces of heavy equipment owned by the Debtors, including the following with the forced liquidation values (from an Accuval appraisal dated February 24, 2011) set forth in relation to each titled vehicle and/or piece of heavy equipment (together, the "Equipment Collateral"):

          (i)    Kenworth Model T800 9055 Wrecker - **$125,000.00**

      (ii)      Freightliner Model F-70 Sweeper Truck - **$30,000.00**

      (iii)     Sterling Model Acterra Single-Axle Rack Truck - **$25,000.00**

      (iv)     Sterling Model LT-9500 Tri-Axle Dump Truck – **$50,000.00**

      (v)      Sterling Model L-7501 Tandem-Axle Dump Truck - **$17,500.00**

      (vi)     Caterpillar Model 330BL Crawler Excavator - **$55,000.00**

      (vii)    Talbert Model T4DW 55SA Lowboy Trailer - **$35,000.00**

      (viii)   McCloskey Model 621 Portable Trommel Screening Plant - **$75,000.00**

      (ix)     Freightliner Model Business Class Single Axle Flatbed Tow Truck - **$32,500.00**

      (x)      Caterpillar Model 320BL Crawler Excavator - **$35,000.00**

      (xi)     Mac 34' Tri-axle Dump Trailer - **$20,000.00**

      (xii)    International Model Century Single Axle Tow Truck - **$30,000.00**

      (xiii)   Sterling Model LT-9500 Tri-Axle Dump Truck - **$40,000.00**

      Total Liquidation Value for the Equipment Collateral - **$570,000.00**

(b)     Blackstone's first priority mortgage on the Sawyer Road Property appraised in 2009 as part of the Blackstone transaction for **$660,000.00**.

(c)     Blackstone's second priority positions on the Parkway Property and the Enterprises Property which properties were appraised in 2009 as part of the Blackstone transaction for **$630,000.00** and **$370,000.00** respectively.

20.    As can be seen from the values set forth above, Blackstone is adequately protected because, even after the priming lien sought by this Motion, Blackstone holds **$1,755,000.00** worth of collateral and is owed, even using its own numbers, approximately **$355,000.00**.

### IV.    **Relief Requested**

21.    By this Motion, the Debtors seek entry of an order:

(a) Approving the terms of the Post-Petition Loan upon the terms set forth herein and in the Term Sheet and in the commitment letter and loan documents, which documents shall substantially reflect the terms of the Term Sheet and shall be filed with this Court as soon as they are finalized.

(b) Granting Coastal a first priority mortgage on the Parkway Property and the Enterprises Property.

(c) Determining that Blackstone is adequately protected by its first priority positions in the Equipment Collateral, its first priority mortgage on the Sawyer Road Property and its second priority mortgages on the Parkway Property and the Enterprises Property.

(d) Finding that Coastal acted in good faith in relation to the Post-Petition Loan under section 364(e) of the Bankruptcy Code.

## V.   Grounds for Relief

22.   Pursuant to section 364(d) of the Bankruptcy Code, a debtor may only incur debt secured by a senior lien on property of the estate that is already subject to a lien if, after notice and a hearing, the debtor is able to show that (a) despite the post-petition borrowing, "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted," and (b) that the debtor was unable to obtain a loan by offering the protections afforded under any other subsection of section 364 of the Bankruptcy Code.  11 U.S.C. § 364(d)(1).

23.   In relation to providing adequate protection, section 361 of the Bankruptcy Code, in turn, provides various methods of adequately protecting a secured party's interests during the course of a bankruptcy proceeding.  11 U.S.C. § 361.  Section 361 states in pertinent part:

> When adequate protection is required under sections 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by:
>
> (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by

> such entity of the indubitable equivalent of such entities interest
> in such property.

11 U.S.C. § 361(3).

24. Section 361(3) was intended to provide for flexible means of adequately protecting a creditor's interest. In re Sky Valley, Inc., 100 B.R. 107, 115 (Bankr. N.D. Ga. 1988) ("The flexible provision of § 361(3) allows for many varied means of adequate protection"). Under the flexible approach utilized by the courts, courts have held that a debtor has provided a creditor with adequate protection in relation to the grating of a priming lien under section 364(d) if the existing lender is protected by an equity cushion in its collateral base. Anchor Village Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 119 (N.D. Ga. 1989) (affirming the bankruptcy court's order authorizing a priming lien and holding that the lender was adequately protected by an equity cushion in the property pledged to the objecting lender and stating "[i]n the instant case, the displaced lienholder is substantially oversecured and is likely to remain so, as the evidence does not suggest the value of the debtor's assets will rapidly deteriorate."); Bray v. Shenandoah Federal Savings and Loan Association (In re Snowshoe Co., Inc.), 789 F.2d 1085, 1090 (4th Cir. 1986) (authorizing post-petition borrowing and the granting of a priming lien premised on the equity cushion protecting the existing creditor and the well reasoned financial analysis provided by the trustee); In re Dunes Casino Hotel, 69 B.R. 784, 796 (Bankr. D.N.J. 1986) (granting a priming lien upon a finding that the existing lender was adequately protected by an equity cushion in its collateral package).

25. The Debtors believe that Blackstone is adequately protected by a substantial equity cushion that exceeds the amount of the obligations owed to Blackstone by a multiple of almost six to one (using what Blackstone contends is owed – the Debtors believe very little is owed). As set forth above, after consideration of the sale of equipment through the First, Second

and Third Sales of Equipment, Blackstone still holds a first priority position on titled vehicles and equipment having a forced liquidation value of **$570,000.00**.  The value of this collateral alone is almost twice what Blackstone claims it is owed.  In addition to the Equipment Collateral, Blackstone also holds a first priority mortgage on the Sawyer Road Property which Blackstone had appraised in 2009 for **$660,000.00**.  In the event the Court grants this Motion, Blackstone will also have second priority mortgages on the Parkway Property and the Enterprises Property which have a combined value of **$1,000,000.00** (again, using the numbers from the appraisals performed in 2009 in relation to closing the Blackstone transaction), leaving approximately **$525,000.00** in value for Blackstone (and this assumes that Coastal does not recover from other assets being pledged to Coastal as part of the Post-Petition Loan).  Using these numbers, Blackstone is over-secured by real property equal to roughly four times the amount of its debt (using Blackstone's numbers).  From the above, Blackstone is adequately protected.

26.     Setting aside the adequate protection issues, the Debtors were unable to obtain financing on any terms other than the first-priority, secured basis contemplated by the Post-Petition Loan.  The Debtors attempted to obtain financing from a number of other sources.  First, Construction had extensive and protracted negotiations with the Finance Authority of Maine ("FAME") in order to obtain a working capital loan from FAME in the amount of between **$300,000.00** and **$500,000.00**.  FAME ultimately denied the request.  A true and correct copy of the FAME denial is attached hereto and is incorporated herein by reference as **Exhibit C**.

27.     In addition to seeking a refinancing from FAME, Construction also engaged in protracted negotiations with Caterpillar Financial Services Corporation ("Caterpillar"), pursuant to which Construction sought to have Caterpillar not only refinance its existing loan, but to advance additional monies in terms of a working capital loan.  After months of negotiations,

Caterpillar refused to make the loan, despite several attempts by Construction to reduce the extent of the refinancing.

28.     The Debtors also sought financing from Century Finance (USA) ("<u>Century</u>") in order to obtain a financing similar to the one currently being contemplated.  Although Century was willing to undertake the financing for $1.1 million (an amount greater than Coastal), the interest rate on the loan was 24% per year, or almost double the rate of interest of the Post-Petition Loan.  When the other costs of the Century loan are compared against the terms of the Post-Petition Loan, the Coastal refinancing is substantially less expensive than the Century loan.  A true and correct copy of the commitment letter relating to the Century loan is attached hereto as **<u>Exhibit D</u>** and is incorporated herein by reference.

29.     The Debtors also sought financing from Flash Island, a local company engaged in making non-conventional loans.  Although Flash Island initially offered terms similar to the terms being offered by Coastal, Flash Island withdraw the term sheet with no explanation and refused to make a loan to the Debtors under its initial terms or any modified terms.

30.     In addition, other non-conventional lenders were approached, however, in light of the circumstances, the loan requests were denied without extensive discussion or negotiation.

31.     Premised on existing defaults with local conventional lenders, in relation to this loan specifically, the Debtors did not believe that it would be productive to expend energy and resources on approaching conventional lenders (although the Debtors did approach Bangor Savings Bank).  In order to satisfy the "unable to obtain credit" requirement, however, a debtor is not required to seek credit from every possible lender and a series of unsuccessful attempts will satisfy this element for post-petition borrowing.  <u>Snowshoe</u>, 789 F.2d at 1088.  Premised on the

above, the Debtors believe that they have explored their options and found the best available refinancing terms under the circumstances.

32.     Finally, the Debtors anticipate retiring the Post-Petition Loan via a number of different possibilities, including the sale of certain property.  Specifically, the Debtors are currently marketing the Parkway Property for sale and anticipate using the proceeds from any sale of that property to pay down or fully retire the Post-Petition Loan.  Additionally, in light of decreases in operating expenses and increased cash flow, the Debtors believe that in the short-term they will be able to obtain financing from a conventional lender and thereby retire the Post-Petition Loan.

WHEREFORE, the Debtors respectfully request that this Court enter an Order granting the relief requested herein, along with such other and further relief as this Court deems just and appropriate.


Dated: May 2, 2011                    **MAIETTA CONSTRUCTION, INC.**

                                      By: /s/ D. Sam Anderson, Esq.
                                      D. Sam Anderson, Esq.
                                      Maire Corcoran, Esq.
                                      BERNSTEIN, SHUR, SAWYER & NELSON, P.A.
                                      100 Middle Street, P.O. Box 9729
                                      Portland, ME 04104
                                      Telephone: (207) 774-1200
                                      Facsimile: (207) 774-1127


                                      **MAIETTA ENTERPRISES, INC.**

                                      By: /s/ David Johnson, Esq.
                                      David Johnson, Esq.
                                      MARCUS, CLEGG & MISTRETTA, P.A.
                                      One Canal Plaza, Suite 600
                                      Portland, ME 04104
                                      Telephone: (207) 828-8000
                                      Facsimile: (207) 773-3210